[Crim. No. 13934. In Bank. Jan. 30, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
M. A. RANDALL, Defendant and Appellant.

## Counsel

M. A. Randall, in pro. per., James T. Lindsey, under appointment by the Supreme Court, and Josef Dubiel, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Michael L. Abrams, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**SULLIVAN, J.**—Defendant M. A. Randall was charged by an amended information with one count of grand theft. (Pen. Code, § 487.1.)[1] After

[1] Unless otherwise indicated, all section references hereafter are to the Penal Code.

a jury trial he was found guilty as charged and was sentenced to state prison for the term prescribed by law. He appeals from the judgment of conviction.

Defendant contends that his confession to the above charge was obtained in violation of the rules announced in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and that its introduction in evidence over his objection constitutes reversible error. We have concluded that this contention has merit. We reverse the judgment.

Defendant was hired on September 25, 1967, as a desk clerk at the Alisal Guest Ranch, a resort near Solvang, California. His duties included those usual for such a position: aiding with the check-in and check-out procedures, arranging advance reservations, and collecting the money paid by departing guests. In the course of this employment, he had access to the cash register in the front office as well as to various cash boxes located elsewhere in the office complex. About noon on Sunday, October 1, 1967, defendant left the ranch in an automobile he had rented the previous day and did not return. He departed without speaking to his supervisor or any other member of the ranch staff, collecting the wages due him for the four and one-half days he had worked, or leaving an address to which these wages could be forwarded.

Shortly after 1 p.m., Mr. Harold Lavonn, the general manager of the ranch, was informed that the defendant, who was then scheduled to be on duty at the desk, had not returned from his lunch hour. Mr. Lavonn hastened to defendant's living quarters, provided on the ranch grounds as part of his remuneration, and discovered that defendant's personal belongings were gone. He immediately began an inventory of the cash on hand in the office area, which revealed that about $550 was missing from the cash register in the front office. The search was continued for another hour and additional losses, amounting to about $185, from cash receptacles in the adjoining auditor's office were discovered. Mr. Lavonn thereupon telephoned the Santa Barbara County sheriff's office in Solvang to report the loss of $765.[2]

One month later, on November 2, 1967, defendant was arrested in his apartment in Los Angeles by Deputy Sheriff Ellson and Sergeant Kales, two officers of the Los Angeles County Sheriff's Department. Upon making the arrest, Officer Ellson advised defendant of his rights in accordance with *Miranda* v. *Arizona, supra,* 384 U.S. 436. The officers did not question him during the brief drive from the apartment to the sheriff's department West Hollywood substation.

---

[2]There is some uncertainty as to the exact amount of cash which was missing. The amended information charged defendant with the theft of $769.

There is some conflict in the evidence as to what transpired during the time from the defendant's arrival at the stationhouse to the interrogation that produced the statement of guilt, the admissibility of which is in issue here. We set forth the two conflicting accounts.

Officer Ellson testified on *voir dire* at the trial that after they arrived at the stationhouse he and Sergeant Kales interrogated defendant for about 15 to 20 minutes regarding an undescribed "report" filed by defendant's female roommate which was in some manner related to his arrest. At some point during this questioning Sergeant Kales informed the defendant that he would be permitted to make two telephone calls.[3] Sergeant Kales then commenced the booking procedure in the course of which defendant completed his allotted phone calls.[4]

Defendant was questioned further that evening by two other detectives, but Ellson did not see him again until the following morning when he and Kales again questioned him on matters not related to the instant proceedings. After this morning session of questioning, Ellson received a telephone call from the Santa Barbara County sheriff's office and learned for the first time of the warrant which had been issued for defendant in connection with the theft from the Alisal Ranch. That afternoon he and Kales once again questioned defendant and, after a reiteration of the admonitions required by *Miranda* and defendant's statement that he was willing to waive those rights, obtained his confession to the crime. No record, either stenographic or electronic, was made of this conversation and defendant did not sign a written confession or waiver form. Instead, Officer Ellson testified that he had made longhand notes of the defendant's statements and that a typewritten report was later prepared from these notes. His testimony

---

[3]Ellson testified that an invitation to make these calls is extended to all arrested persons as a standard procedure of the Los Angeles County Sheriff's Department. It is intended to comply with Penal Code section 851.5 which provides, in relevant part: "Any person arrested has, immediately after he is booked, and except where physically impossible, no later than three hours after his arrest, the right to make, at his own expense, in the presence of a public officer or employee, at least two telephone calls from the police station or other place where he is booked, one completed to the person called, who may be his attorney, employer, or a relative, the other completed to a bail bondsman." The usual method in which this is accomplished is for the person being booked to inform the officer who is conducting the booking whom he wants to call. The officer will then dial the number and, when the connection is completed, hand the receiver to the caller.

[4]Ellson testified that since he was occupied with other matters at the time, he did not know to whom defendant placed the two calls or the content of the conversations. He did know, however, that defendant had made two calls, since the numbers were entered on the booking sheet. From subsequent investigation he had discovered that one call was placed to Carol Righter, an astrologer, and the other to Harry Weiss, an attorney. Ellson testified that "as a Sergeant in the Sheriff's Department [in Los Angeles]" he recognized "the name Weiss as being a prominent defense attorney in Southern California."

on *voir dire* relating the confession was substantially identical to that given later before the jury: "Mr. Randall stated that he had worked at Alisal Ranch the previous month as a clerk. He stated that one day he was alone at the desk, that he left with about $750.00 of the ranch money and all his luggage."

Defendant testified on *voir dire* that he had informed one of the arresting officers that he wanted to talk to his attorney during the initial interview conducted immediately after arriving at the substation and that they discontinued the questioning at that point and took him over to the booking room. His account of the events in the booking room corresponds to that of Officer Ellson and, to the extent that it is more fully detailed than that of the officer, is uncontradicted. According to his testimony, he asked the uniformed deputy on duty at the booking desk to look up the correct spelling of Mr. Weiss' name and to place a call to his residence. During the ensuing conversation defendant informed Weiss of his predicament, Weiss advised defendant of his constitutional rights, assured him that he would begin proceedings to secure his release, and stated that he would talk to him later and advise him further at that time. While this discussion (and that with Righter on the subsequent call, see *ante,* fn. 4) were proceeding, Sergeant Kales was present at the booking desk and listening to them.

Defendant's version of later periods of interrogation differs markedly from that presented by Ellson. Defendant corroborated the fact that three such sessions took place and that the interrogating officers warned him of his rights in substantially the same terms as they had previously done. However, he denied having made the confession and stated that he repeatedly informed the officers he wanted to talk to his attorney and that he never waived his rights to the presence of counsel.

The trial court found that defendant had been fully and adequately informed of his constitutional rights directly after his arrest and that the subsequent warnings (repeated before each period of questioning including the one at which the statement admitting guilt was made) coupled with the fact that he did make such a statement demonstrated that the waiver of his rights made before his confession was knowing and voluntary. It therefore held that the confession was admissible.[5]

---

[5]The court also apparently found that defendant had communicated his desire to contact his attorney to at least one of the officers at the stationhouse at the time of his arrest and booking. In ruling on the admissibility of the confession, the court remarked: "It comes down to the question of whether the defendant then, intelligently waived the right to have counsel present. The fact does stand out that having been advised a number of times of his rights, *and having, in fact, requested an attorney. . . . it* does stand out that the defendant did in fact, make a statement." (Italics added.)

On this appeal we accept that version of events which is most favorable to the People, to the extent that it is supported by the record. Thus, we must accept the testimony of Officer Ellson insofar as it is incompatible with that of the defendant and confine our review beyond such testimony to facts which are uncontradicted by the People. (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 570-573 [75 Cal.Rptr. 642, 451 P.2d 74], petition for cert. dismissed, 394 U.S. 1025 [23 L.Ed.2d 743, 89 S.Ct. 1646] (whether confession coerced or not); *People* v. *Johnson* (1969) 70 Cal.2d 469, 473, 476-478 [74 Cal.Rptr. 889, 450 P.2d 265] (whether waiver of rights under *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] was knowing and voluntary or not); *People* v. *Stoner* (1967) 65 Cal.2d 595, 598 [55 Cal.Rptr. 897, 422 P.2d 585] (whether confession was product of illegal search or not); *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418] (whether confession was voluntary or not).) Viewed by this standard the admission of the confession was error.

■ *Miranda,* of course, is not satisfied by a mechanical recitation of its four required warnings, even if this recitation precedes each of several interrogations of a suspect held in police custody. ■ "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. (Fn. omitted.) At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. ■ *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.*" (Italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

We have interpreted these directives of the high court as imposing upon the police a duty to respect the right of a suspect once in custody to decide to defer questioning, preclude it entirely, or delay it until he has had an opportunity to consult fully with an attorney. This obligation on the police to entirely terminate custodial interrogation upon invocation of the Fifth Amendment privilege is one of the primary "protective devices" fashioned by *Miranda.*[6] We have a constitutional responsibility to insure that "extra-

---

[6]"Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can

judicial statements of criminal defendants not be admitted at trial unless the full range of 'protective devices' prescribed by *Miranda* was in operation at the time such statements were obtained." (Fn. omitted.) (*People* v. *Ireland* (1969) 70 Cal.2d 522, 534 [75 Cal.Rptr. 188, 450 P.2d 580].)

■ This duty to cease questioning only commences, however, upon a suspect's initial indication that he wishes to exercise his Fifth Amendment privilege. If a suspect is willing to discuss his case fully with police officers after having been taken into custody and advised of his rights, *Miranda* imposes no constitutional inhibition to continued questioning. However, a suspect may indicate that he wishes to invoke the privilege by means other than an express statement to that effect; no particular form of words or conduct is necessary. ■ "A suspect may indicate such a wish in many ways. He may, as in [*People* v. *Fioritto* (1968) 68 Cal.2d 714 (68 Cal. Rptr. 817, 441 P.2d 625)] refuse to sign a waiver of his constitutional rights; he may simply refuse to continue an interrogation already in progress; or he may, as in the instant case, ask for an attorney." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 535.)

To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda's* prophylactic intent. Moreover, it would benefit, if anyone, only the experienced criminal who, while most adept at learning effective methods of coping with the police, is least likely to find incarceration and police interrogation unnerving. Conversely, it would operate most severely on the ignorant and unsophisticated suspect who is most susceptible to the compulsion arising from the tactics of custodial interrogation and consequently most in need of the protections outlined by *Miranda.*

The People contend that defendant's telephone call to his attorney should not be considered tantamount to the request for an attorney in *Ireland* or the refusal to sign a waiver in *Fioritto.* They argue that such a phone call made by a suspect from a police station, after the suspect has been arrested and while he is being booked, in no way signifies his desire not to talk to police or to have his attorney present during any interrogation. Accordingly, they assert that since defendant did not invoke the privilege, there was no necessity for the suspension of police questioning. Thus, the People

truly be the product of his free choice." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 458 [16 L.Ed.2d 694, 714, 86 S.Ct. 1602, 10 A.L.R.3d 974]. See also *People* v. *Ireland* (1969) 70 Cal.2d 522, 534, fn. 11 [75 Cal.Rptr. 188, 450 P.2d 580] and corresponding text.)

argue, the subsequent confession was, as the trial court found, the product of a knowing and voluntary waiver of defendant's *Miranda* rights. Alternatively, the People suggest that even if the phone call *is* considered an invocation of the privilege, this should not prevent a later voluntary waiver which occurred in the instant case. Neither position is tenable.

In the first place, the People have advanced no sensible distinction between the actions of defendants in *Fioritto* and *Ireland* and that of the defendant in this case relative to the characterization of those actions as invocations of the privilege. In each case the conduct reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time.*[7] While it is of course possible that in some instances a suspect taken into custody may desire to contact his attorney simply to arrange for bail, or to inform him of his arrest and instruct him to convey this information to others, more frequently an arrested person will want the advice of his attorney as to how he should conduct himself with the police. Often, he will want to see the attorney personally.[8]

---

[7]It is, of course, not inconsistent with either of two divergent subsequent occurrences: (1) a change of mind on the part of the defendant prompted by the advice of counsel, his own psychological make-up, or similar facts; or (2) a change of mind prompted by continued interrogation and efforts to convince the defendant to communicate with the officers. The former is not proscribed by *Miranda,* nor by our application of its teaching in *Fioritto* and *Ireland.* "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 478 [16 L.Ed.2d at p. 726].) "Not only did we affirm our adherence to this principle in the *Fioritto* case, but we also there indicated that even a defendant in *custody* might make statements admissible under *Miranda* if it were shown that such statements were the result of the defendant's own initiative and did not arise in a context of custodial interrogation." (*People* v. *Ireland, supra,* 70 Cal.2d at p. 536.)

[8]The phone call to an attorney can hardly be considered the equivalent of a private personal conference with him. Penal Code section 851.5 requires that the call be made in the presence of a government official, who most often will be a law enforcement officer. In the instant case, for example, two sheriff's deputies stood nearby while defendant conversed with Mr. Weiss. Under such circumstances most suspects will naturally feel somewhat reticent, and open and candid exchange of information, so vital to counsel's ability to competently advise his client, will be severely impaired. Consequently, we cannot conclude that a call to an attorney should be sufficient to immunize a suspect from any efforts of the police to induce him to· discuss his case. We do not think that a mere telephone call placed by the arrested person from the police station to an attorney is necessarily such an adequate protective device "to dispel the compulsion inherent in custodial surroundings" (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 458 [16 L.Ed.2d at p. 714]) that we can consider his subsequent waiver of his rights to counsel and to remain silent as voluntary when such waiver is prompted by questioning initiated by the police rather than by the

In any event, we are not disposed to assume as a general matter that a telephone conversation with an attorney such as occurred in the case at hand is not a manifestation of a suspect's intention to assert his privilege. We were unwilling to make such an assumption in the analogous situation in *Ireland* and no persuasive reason suggests a different course here.[9]

■ The People have the burden of demonstrating that a questioned confession meets the constitutional tests of admissibility. (See *People* v. *Davis* (1967) 66 Cal.2d 175, 180 [57 Cal.Rptr. 130, 424 P.2d 682]; *People* v. *Charles* (1967) 66 Cal.2d 330, 340-341 [57 Cal.Rptr. 745, 425 P.2d 545].) ■ When, as appears here, the suspect to the knowledge of the police completes a call to his attorney, the People—if they contend that the fact of such a call should not be considered an invocation of the privilege—must affirmatively demonstrate that the suspect was not thereby indicating a desire to remain silent until he had obtained the full advice of his counsel.

Here the People did not attempt to meet this burden. Their only witness on *voir dire,* Officer Ellson, testified that he was not present when the call was made and thus did not know the identity of its recipient, much less its contents.[10]

---

arrestee's own uninfluenced choice. The court recognized this in *Miranda*: "Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. *Escobedo* v. *Illinois,* 378 U.S. 478, 485, n. 5 [12 L.Ed.2d 977, 982, 84 S.Ct. 1758]. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 470 [16 L.Ed.2d at p. 721].)

[9]In *Ireland,* the defendant had remarked to one of the arresting officers, "Call my parents for my attorney." We stated: "[W]e do not think that the *Miranda* decision permits speculation on our part as to whether the defendant wished to see his attorney prior to interrogation or merely wished to consult with his attorney at some unspecified future time." (*People* v. *Ireland, supra,* 70 Cal.2d at p. 535.)

[10]The fact that Officer Ellson may not have known of the placing of the call will not excuse his subsequent questioning. As we said in *Ireland, supra;* "The fact that a failure of communication within the police department might have been at fault can have no effect upon our decision. Our concern lies with the fact that, for whatever reason, custodial interrogative processes *did not cease* upon assertion of the privilege." (70 Cal.2d at p. 536, fn. 12.) To hold otherwise would open the door to evasions by the police. (See *People* v. *Milton* (1969) 270 Cal.App.2d 408, 415 [75 Cal.Rptr. 803].) Of course, the police must be aware that defendant has called his attorney for the obligation to respect the assertion of the privilege to arise. Here, from the testimony of Officer Ellson and from the uncontradicted testimony of the defendant it is clear that at least two members of the sheriff's department knew that the call had been placed to defendant's attorney, one of whom participated in the subsequent interrogations.

■ We hold that, in the absence of evidence compelling a contrary interpretation, a telephone call to an attorney must be construed to indicate that the suspect desires to invoke his Fifth Amendment privilege. *Miranda* teaches that the processes of custodial interrogation must cease at that point. Since they did not in this case, the statement elicited by the subsequent questioning was inadmissible.

The People contend, however, that the confession was nevertheless admissible since it was preceded by a voluntary waiver of the privilege previously asserted. This argument was fully considered and rejected in the identical factual contexts of *Fioritto* and *Ireland*. ■ After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary. The record in this case is clear that the defendant made no efforts to communicate with the police after his conversation with the attorney and each session of questioning was resumed on the initiative of the arresting officers. It is just such police-initiated interrogation that *Fioritto* and *Ireland* hold *cannot* produce voluntary waivers or spontaneous statements. (68 Cal.2d at pp. 719-720; 70 Cal.2d at pp. 535-536.)

■ Since the introduction in evidence of a confession obtained from a defendant in violation of constitutional guarantees is prejudicial, per se, this error alone compels reversal of the judgment. (*People* v. *Fioritto, supra,* 68 Cal.2d 714, 720; *People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]; *Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 915, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., and Mosk, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Fleming in the opinion prepared by him for the Court of Appeal, Second District, Division Two (*People* v. *Randall,* 2 Crim. 15517, filed August 15, 1969, certified for nonpublication).

**BURKE, J.**—I dissent. The crucial question on this appeal is whether under *Miranda*[1] the making of a telephone call by defendant to an attorney during the booking process has the same effect as if defendant during police in-custody interrogation asserted his rights to remain silent, or to have an attorney present.

---

[1]*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

The majority opinion answers this question in the affirmative rendering inadmissible statements given by defendant during a subsequent custodial interrogation at a separate time and by different officers at which, after again being fully informed of his rights, defendant expressed the desire to waive them and made the objected-to statements. In addition to *Miranda* the majority rely on this court's decisions in *People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], and *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. I submit that these decisions do not impel the ruling of the majority in this case and that it is an unwarranted extension of the *Miranda* holding.

In *Miranda, supra* (at pp. 444-445 [16 L.Ed.2d at pp. 706-707]) the court stated: "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that *he does not wish to be interrogated,* the police may not question him." (Italics added.)

In the instant case defendant (1) *in no manner* indicated to the police that he desired to see an attorney *before speaking;* and (2) gave *no indication* to them that *he did not wish to be interrogated.* Before the commencement of each separate interrogation the police scrupulously gave defendant the full *Miranda* warning, asked him if he understood his rights and if he was willing to give up these rights and talk with the officers. In each instance he indicated he understood his rights and was willing to talk to the officers. This case is therefore clearly distinguishable from a *Miranda*-type interrogation during which a defendant indicates that he desires to consult his attorney before he answers any questions or that he desires to have his attorney present during such questioning.

In *People* v. *Ireland, supra,* 70 Cal.2d 522, *during* the process of interrogation upon his arrest defendant was asked whether he had anything to say and his response was "Call my parents for my attorney," but this request was not complied with and our court held that since the defendant had indicated he wanted an attorney the interrogation should have terminated until an attorney was present.

*People* v. *Fioritto, supra,* 68 Cal.2d 714, likewise is clearly distinguishable from the instant case. There, after defendant was brought into the police station he was advised of his *Miranda* rights and was asked to sign a waiver. Defendant refused. Immediately thereafter he was confronted

with two accomplices who had confessed, whereupon he subsequently waived his rights and confessed to the crime. This court ruled that in refusing to sign the waiver defendant in effect indicated that he wished to remain silent and that under the application of *Miranda* the interrogation should have terminated immediately.

It is also worthy of note that this defendant was not without knowledge and experience in dealing with police. He had previously been convicted of a felony and was subsequently charged and admitted the prior conviction. The trial judge heard the testimony of both the police officers and the defendant and was convinced that there was no impropriety, and for the reasons indicated I believe the conviction of the defendant should be affirmed.