[Crim. No. 17277. First Dist., Div. Three. July 24, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES L. WEBB, Defendant and Appellant.

### COUNSEL

Jonathan Matthew Purver, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**FEINBERG, J.**—This is an appeal from the judgment following appellant's conviction of voluntary manslaughter under Penal Code section 192, subdivision 1.

On March 5, 1977, Melody Howard asked Carnell Brunner, the man she lived with and the victim in this case, to purchase a bag of heroin for her. Brunner asked James L. Webb, appellant herein, to get a bag for him, which appellant did, charging Brunner $14. Brunner delivered the bag to Melody, who discovered that it did not contain heroin. Brunner and Melody then sought appellant in order to get the $14 back.

The following day, March 6, at about 3 p.m., Melody and Brunner located appellant. Appellant claimed he hadn't intended to "burn" them and offered to repay the $14 after he earned some money by selling prescriptions and pills. Throughout the day, Brunner continued pressing appellant for the return of his money which appellant assured him he would do. Melody was with Brunner, goading him on to do something to get the money back.

That evening, Brunner and appellant got into a fight. Brunner was 5 feet 10 inches tall and weighed 162 pounds. Dr. Stephens, a coroner, described Brunner as a "well-developed muscular individual." Appellant is about 6 feet tall and weighs 195-199 pounds. Appellant had a cast on his left arm, starting one inch below his elbow and covering his knuckles.

Appellant claims Brunner initiated the fight. With the exception of Melody Howard, witnesses to the fight agreed that Brunner was swinging at appellant, who was on the defensive, backing up until a glass cafe window was behind him. Melody testified that Brunner was backing away

from appellant. At some point during the fight, appellant drew a folding knife with a locking mechanism from his pocket, cutting his finger as he opened it. He struck out with the knife, wounding Brunner six or seven times, and once stabbing himself through his cast. After the fight ended, Melody had Brunner taken to a hospital where he died. About 2:30 in the afternoon of March 7, Melody saw appellant on the street, stopped a police car that was cruising by and pointed appellant out to the police. Appellant was then arrested.

Three questions are presented on this appeal: (1) was a statement made by appellant to Melody Howard while being transported in a police car improperly admitted; (2) did the court err in admitting a tape recording of a statement made by appellant to the police; and (3) is there substantial evidence to support the conviction of voluntary manslaughter?

*The Court Properly Admitted a Statement
Made by Appellant to Melody Howard While
They Were Riding in a Police Car*

After the police arrested appellant, he was driven to the Hall of Justice along with Melody Howard. En route, she repeatedly asked him why he killed Brunner. At first he told her to shut up, but finally replied, "Because you put him out there." Appellant contends that this incriminating statement was made in response to a process of interrogation conducted by an agent of the police placed in the vehicle with appellant to elicit damaging admissions before appellant was given his *Miranda* warnings.

The *Miranda* requirements apply to ". . . questioning initiated by law enforcement officers . . . ." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 706, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Melody Howard was neither a police officer nor a police agent. There is no evidence her questions to appellant were anything other than a spontaneous reaction to the situation nor is there any evidence to suggest that her presence in the police car was other than a fortuitous event occasioned by her seeing appellant on the street. Nor is *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] applicable. For even if the circumstances under which appellant's statement was made were analogous to the facts in *Massiah* (they were not, as we have noted above), "the principles expressed in *Massiah* do not apply in a preindictment setting." (*People* v. *Murphy* (1972) 8 Cal.3d 349, 362 [105 Cal.Rptr. 138, 503 P.2d 594].)

### The Court Did Not Err in Admitting a
### Tape Recording of a Statement Made by
### Appellant to Police

Upon appellant's arrest, he was taken to police headquarters. At 3:32 p.m., interrogation was attempted by Inspector McCoy with Officers Chase and Willet present. The interview was taped.

Appellant, who gave his name to the officers as Fragee Fred Lofton and produced a driver's license in that name, was advised of his *Miranda* rights. Before the officer could even begin his recital of the *Miranda* rights and before any question was put to appellant, appellant volunteered the statement that he had no knowledge of the stabbing of Brunner. Appellant then stated that he didn't wish to speak to the police any further but desired medical attention. Inspector McCoy terminated the interview and turned off the tape recorder at 3:36. At 3:42 the interview was reopened, continued until 3:57 and was recorded. During this 15-minute period, appellant made a more complete exculpatory statement of the incident, which exculpatory statement was used to impeach his later trial testimony that he killed Brunner in self-defense. Appellant asserts that this statement should have been suppressed. We disagree.

There was a hearing, outside the presence of the jury, on the admissibility of the taped exculpatory statement. At that hearing evidence was adduced from Inspector McCoy, Officer Chase and appellant as to what happened during the six-minute interval between appellant's recorded statement that he didn't want to talk and the time his recorded statement began again.

Not surprisingly, the evidence is in sharp conflict. Appellant testified that when the tape recorder went off, Inspector McCoy initiated a conversation to the effect that if appellant wanted medical attention, appellant should try to help solve the case since no medical care would be furnished until after the interview. Furthermore, McCoy, appellant testified, indicated that if appellant would talk, he, McCoy, could get to work "proving [appellant's] innocence and [appellant] can be out that much more quicker."

McCoy testified at the suppression hearing that when appellant initially indicated that he did not wish to be interrogated, he, McCoy, turned off the recorder, began to assemble it so that it could be removed from the interrogation room and then got up from his chair preparatory to leaving.

At that point, appellant stated that he wanted to talk to the officers because he had information that would prove his innocence. Thereupon, appellant was advised that he could have an attorney and the police could then get this information from appellant but wouldn't do so until he did get an attorney. Appellant responded by saying that he would waive this right. Thereupon, the recording was started again.

McCoy denied initiating any conversation with appellant during that six-minute hiatus; he denied that there was any conversation relating to appellant's need for medical attention in that time. In short, he denied that anything was said or done other than that to which he testified.

Officer Chase also testified at the suppression hearing. He was one of the two arresting officers who transported appellant to police head-quarters. His testimony was that after the recorder was turned off, within a minute or two, appellant volunteered that he "wanted to make a statement . . . [t]o prove his innocence, that he didn't do it." In that minute or two before appellant spoke, Chase had said something to McCoy about the driver's license in the name of Lofton that appellant had presented for identification. Chase testified he could recall no other conversation in the six-minute interval. He testified that appellant had asked to see a doctor but he didn't know at what point in time the request was made. At the end of the taped statement, it appears that Inspector McCoy did speak about getting medical attention for appellant.

When the tape was restarted, the following exchange took place: McCoy: "Mr. Lofton, since the tape recording was turned off, you've indicated to us that you'd like to waive your right to an attorney at this point to tell us a few questions [sic]. Is that correct?" Appellant: "No. A few questions that would help us to establish my innocence by me answering them and by me telling in respect to that only. I waive my right to an attorney to tell in respect to proving my innocence." The statement then made by appellant and recorded consisted of an alibi, an elaboration of his original assertion that he didn't know anything about the matter.

■ It is reasonably certain now that no statement, inculpatory or exculpatory, obtained from defendant in violation of his *Miranda* rights is admissible for any testimonial purpose over defendant's objection. (See *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].)

■ From *Miranda* to its most recent high court offspring in California, *In re Michael C.* (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7], it is clear beyond cavil that once *Miranda* comes into play, police interrogation must cease the moment the suspect indicates in some manner that he is asserting his Fifth Amendment privilege not to incriminate himself.[1] There is no question here but that appellant did so assert his privilege timely; respondent concedes as much. But this does not end our inquiry.

Though police interrogation must cease with the invocation of the Fifth Amendment privilege, the suspect may change his mind and decide to give a statement and such a statement is admissible *provided* the change of mind is *voluntary*.[2] (See *People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 736-737 [125 Cal.Rptr. 798, 542 P.2d 1390].)

[1]We distinguish the situation where police questioning continues despite the defendant's refusal to waive his *Miranda* rights, but the defendant's tape-recorded statements are admitted at trial neither for the truth of what is contained therein nor to show a consciousness of guilt nor to impeach his veracity as a witness.

Recently, this court decided *People* v. *Rucker*■ (Cal.App.). In *Rucker*, we affirmed appellant's conviction of robbery and murder even though appellant's taped statements, elicited by continued questioning after the defendant had invoked his *Miranda* rights, were admitted in evidence. We held this not to be error. The defense there was diminished capacity due to the ingestion of drugs and alcohol. In rebuttal, the prosecution offered in evidence defendant's answers to the continued questioning. They were admitted "with the limiting instruction that they were to be considered only for the thought process, the clarity of voice, and the intonation of appellant." (*Op. cit. supra.*) For these purposes, we do not perceive that the statements come within the privilege against self-incrimination upon which *Miranda* is bottomed. (See *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *United States* v. *Dionisio* (1973) 410 U.S. 1 [35 L.Ed.2d 67, 93 S.Ct. 764]; *People* v. *Ellis* (1966) 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393]; and further explicated in *Disbrow.*

Of course, we recognize that if the *content* of the statements becomes of such a prejudicial nature that to achieve the effect of a limiting instruction requires an effort of will beyond the capability of mere mortals, it would be error to receive such statements in evidence. (*People* v. *Disbrow, supra,* 16 Cal.3d at p. 112.) That was *not* the situation in *Rucker.*

[2]It is interesting to note that in *Disbrow, supra,* the court was impelled, in part, by its view that the rule it was announcing would avoid the necessity for appellate courts to "grapple on a case-by-case basis with the question of what is an involuntary statement. . . . [P]recisely the evidentiary thicket *Miranda* was designed to avoid." (Fns. omitted.) (*People* v. *Disbrow, supra,* 16 Cal.3d at pp. 111-112.) Unfortunately, in light of the ingenuity of lawyers and the almost infinite variety of circumstances under which the issue of voluntariness may arise, it appears that the court may have been expressing only a pious hope.

■ In determining from the record whether a "change of mind" is voluntary where the suspect had theretofore invoked his Fifth Amendment privilege, case law has developed the following propositions:

1. "[A] change of mind prompted by continued interrogation and efforts to convince the defendant to communicate with the officers" is not voluntary (*People* v. *Randall* (1970) 1 Cal.3d 948, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]), for it is the defendant who must *initiate* the discussion that leads to his giving the statement. (See *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Lara* (1967) 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202].)

2. A change of mind induced by promises of benefit or leniency made by the police is not voluntary. (*People* v. *McClary, supra,* 20 Cal.3d at pp. 227-228.)

We address ourselves now to the evidence in the record adduced on the objection to the introduction of the tape. ■ In so doing, we are, of course, not bound by the trial court's determination that the statement was voluntary for it is our responsibility to make an independent determination on the uncontradicted facts. (See *People* v. *McClary, supra,* at p. 227.) However, when the evidence is in conflict, we must accept the trial court's determination of the facts insofar as that determination is supported by the record. (*Ibid.*)

1. Who initiated the conversation in the six-minute hiatus in the tape? The evidence is in flat contradiction. The two police officers testified that it was appellant; appellant testified it was Inspector McCoy. Obviously, the trial court believed the officers. There is nothing in the record to indicate that the police officers' version is inherently incredible. Accordingly, we are bound by the trial court's determination that the conversation that led to the recorded statement was initiated by appellant.

2. Was there any offer of a benefit or leniency by the police to appellant to induce the appellant to talk? We accept appellant's contention in this regard to the extent that we agree that if appellant was told, in effect, as he testified, that the sooner he talked, the sooner he would get medical attention,[3] the statement obtained would not be voluntary. But

---

[3]The day before, in the course of the fight, appellant had cut himself with the knife. It is undisputed that at the time of the interview there was blood on appellant's finger. Whether there was bleeding and, if there was, the profuseness and gravity thereof is not clear from the record.

here, too, the evidence is in sharp conflict. Inspector McCoy testified there was no mention of medical treatment in the six-minute unrecorded period. Officer Chase testified that there was a request by appellant for medical attention but he didn't recall whether it was said before, during or after the six-minute gap in the tape. It should be observed that at the end of appellant's recorded statement, appellant is heard to request that he be taken to a hospital. Chase denied that anything was said by the police during the six-minute interval relative to taking or not taking appellant to a hospital. Again, implicit in the denial of appellant's motion to suppress, is the trial court's acceptance of the police version. The record supports the trial court.

So, too, we dispose of appellant's implicit argument that he changed his mind because Inspector McCoy told him that if he would talk, the police could go about proving appellant's innocence sooner. In so doing, we do not decide that if Inspector McCoy had so stated, it would have rendered the statement inadmissible for " 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People* v. *McClary, supra,* 20 Cal.3d at p. 228.)

3. Appellant relies on the proposition that a change of mind is not voluntary if "[t]he record . . . [is] silent on the motivation for appellant's confession when questioning was resumed after he had asserted his *Miranda* right." (*People* v. *Parker* (1975) 45 Cal.App.3d 24, 30 [119 Cal.Rptr. 49].)

*Parker* cites *Fioritto, supra,* 68 Cal.2d 714, and *Randall, supra,* 1 Cal.3d 948, as "compelling" its holding. (*Id.*) Our reading of *Fioritto* and *Randall* not only does not "compel" such a holding, it does not even inferentially suggest it. ■ As we understand the law, while a motive for a change of mind may be some evidence that the change of mind was voluntary, if in fact the defendant who had once asserted his *Miranda* right changes his mind and initiates a statement to the police not as a result of any untoward action on the part of the police, the statement is admissible without regard to the motive for the change of mind.

Consider the following situation: A suspect has been arrested and brought to the police station for interrogation. The officer advises the suspect of his *Miranda* rights. The suspect says he doesn't wish to make a statement. The officer says "fine" and gets up to leave, whereupon the

suspect says, "I've changed my mind; I waive my rights and I'll give you a statement." Whether the suspect was motivated to change his mind by whim or because he suddenly felt a need for absolution or catharsis by confession or, as in the case at bench, because he wanted to deceive the police, would seem to be irrelevant to the issue of whether the statement was voluntary.

We do not suggest that *Parker* was improperly decided for, among other things, it is clear that the initiating force there in obtaining defendant's statement after defendant had asserted his *Miranda* right was a police officer and not the defendant. As we have noted, such a statement is proscribed.

█ If, however, *Parker* is right and we are wrong, the record here affirmatively shows appellant's motive for changing his mind: he wanted to establish his innocence.[4]

We observe in passing that in no event was reversible error committed. Since the statement was not a confession, its erroneous admission is not reversible error per se; rather, the test is that "the People [must] show beyond a reasonable doubt that the error complained of did not contribute to the verdict [citations]." (*People* v. *McClary, supra,* 20 Cal.3d at p. 230.)

Here, appellant, before any question had been put to him, volunteered the remark that he didn't know anything about the killing. The statement objected to was an elaboration of that remark.

At trial, appellant defended on the ground of self-defense.

The statement was admitted on the People's case in chief. As a part of the People's case in chief, the statement was admissible only as it might be inferred therefrom that appellant showed a consciousness of guilt by denying to the police any knowledge of the matter.

But appellant had volunteered a statement that he didn't know anything about it before he made the statement objected to; in fact, before the police had even had the opportunity to advise him of his

[4]It would be pure sophistry to argue that appellant's stated reason for changing his mind—to prove his innocence—was in fact not his true reason since the tale he spun was a complete fabrication and, hence, the People have not demonstrated appellant's motive from the record.

*Miranda* rights. Thus, the effect of the statement objected to was only cumulative to what appellant had already said insofar as his denial of knowledge might have shown a consciousness of guilt. The same analysis is, of course, applicable insofar as the statement objected to was used as impeachment of appellant's veracity as a witness at trial. Reviewing the whole record, if there was error (and we do not believe there was), we are satisfied beyond a reasonable doubt the error did not contribute to the verdict.

### Is There Substantial Evidence to Support the Verdict?

■ The thrust of appellant's argument is that, as a matter of law, the evidence shows that appellant acted in self-defense in killing the victim. No contention is made that the trial court's instructions of law on self-defense were erroneous.

The essence of appellant's argument is that the evidence shows that (1) the victim was the aggressor; (2) appellant was retreating; and (3) appellant pulled the knife to protect himself from being killed by being hit over the head with a bottle.

As to who was the aggressor in the fight, the only clear testimony on the point was appellant's who said the victim was the aggressor. But the jury, of course, was not required to believe appellant.

Assuming the decedent initiated the fight, the evidence is in conflict as to who was retreating during the course of the fight. A number of witnesses testified that appellant was retreating; Melody testified that decedent was retreating. It is not our function to reweigh the evidence. (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887].) Even though we might well conclude that Melody's testimony was suspect in this regard, it was for the jury, it is not for us " '. . . to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].)

Finally, there is a conflict in the testimony as to when appellant drew his knife. Appellant testified that he drew his knife after Melody screamed that she was going to kill him and then hit him over the head with a bottle. Melody testified that she took a bottle and hit appellant on the head with it because appellant had stabbed the decedent at least once.

It does seem odd that if appellant drew his knife to defend himself against the bottle-wielding Melody, it was the decedent who was stabbed some six or seven times. In any event, as we have already noted, it was for the jury to resolve that conflict and if it was resolved adversely to appellant, it is not for us to substitute our resolution for the jury's.

In short, we are satisfied there is substantial evidence to support the verdict.

Accordingly, the judgment is affirmed.

Scott, Acting P. J., and Jenkins, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 20, 1978. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.