[Crim. No. 31548. Second Dist., Div. Two. Oct. 18, 1978.]

In re LOUIS F., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
LOUIS F., Defendant and Appellant.

**COUNSEL**

Henry Sack, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Jeffrey A. Joseph, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROTH, P. J.**—An amended petition filed May 9, 1977, alleged that appellant, a minor aged 17, committed murder and robbery on May 3, 1977, that in connection therewith he used a firearm and that he was a

person coming within the provisions of then section 602 of the Welfare and Institutions Code. Following an adjudication hearing, the court found the allegations to be true and ordered appellant placed with the California Youth Authority. The appeal is from the orders sustaining the petition and declaring appellant a ward of the court pursuant thereto.

The evidence adequately discloses the murder occurred at approximately 2:25 a.m. on the morning of May 3, 1977. The victim was an employee of a gasoline service station, working alone. A truck driver (Haven), detained by a stoplight at the intersection where the station was located, heard what sounded like a gunshot and immediately thereafter saw a man running from the station, about 25 or 30 feet from the station's office and 50 feet from Haven. The man, whose face he could not see, appeared to be wearing a gray-looking shirt, green pants and a baseball-type cap with bill. At almost the same time, a tow truck driver (Golob) was on a freeway adjacent to the service station, answering a call regarding a disabled vehicle. He saw a male negro wearing the same kind of clothing run across the freeway. A highway patrol officer (Anderle) who was assisting Golob also saw the man run across the freeway and, after he had escorted the disabled vehicle's removal therefrom, detained the same man, who was appellant, for an abbreviated period cut short by Anderle's responding to a radio call for assistance to a fellow officer elsewhere.

Consistently within the given time framework and after he had heard the shot and witnessed the man running from the station, Haven went to the station's office where he saw the victim lying on the floor bleeding about the head. Sheriff's deputies were called and arrived within a few minutes.[1] Deputy Sheriff Gilbert (Gilbert), having monitored a radio call regarding a shooting at the location of the station and which described a suspect wearing a gray top, dark pants and a baseball cap running up onto the freeway, patroled the general area. He met Golob who related to him the description of the man Golob had seen running across the freeway. Shortly thereafter and in the immediate vicinity, wholly industrial in character, Gilbert observed appellant walking, approached him and summarily effected his arrest. At that time, appellant was wearing a gray shirt or shirt type jacket, green pants, a golf or baseball-type cap and black gloves. He had in his possession $35 in currency in the denominations of ten "ones," three "fives," and one "ten." A subsequent check at the gas station showed the victim had

---

[1] Officer Anderle observed a sheriff's vehicle at the gas station just prior to the time he detained appellant.

acquired $37.09 from gas sales since his arrival at work, which was missing from an open cash register drawer.

The disabled vehicle attended by Golob belonged to a friend of appellant's who in his company, had been arrested and incarcerated for drunkenness at about 10:30 p.m. the evening of May 2, 1977. Its ignition housing had been dismantled. Though some 20 police officers searched the immediate and surrounding area of the killing, no weapon was ever found. Examination for fingerprints at the gas station disclosed none traceable to appellant. No tests on appellant's gloves for powder residue were made.

Appellant contends:

1. His arrest was without warrant or probable cause, and was, therefore, unlawful.

2. His interrogation beyond his request for a parent, and beyond his express refusal to talk with the officer was error.

3. There was insufficient evidence to sustain the conviction.

■ For his first assertion, appellant relies upon the authority of *People* v. *Curtis* (1969) 70 Cal.2d 347 [74 Cal.Rptr. 713, 450 P.2d 33], wherein it is stated: "We now apply the foregoing principles to the facts before us. First, as to the lawfulness of the arrest, it appears that the officer lacked probable cause when he arrested defendant. The only information the officer possessed was a description of the suspect's race, the color of his clothing, and the general area of the alleged burglary. No doubt he had sufficient grounds to detain and question defendant (*People* v. *Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]); but it is evident that he lacked probable cause to arrest him. As in *Mickelson* 'There could have been more than one tall white man with dark hair wearing a red sweater abroad at night in such a metropolitan area' (*id.,* at p. 454), so there could have been more than one Negro in a white shirt and tan trousers in the neighborhood on the night defendant was arrested. Defendant made no furtive or suspicious movements; he stopped on command and was cooperative until the officer attempted to detain him physically; he had a plausible explanation for his where-abouts, since he lived a block from where he was arrested. This is not 'such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion' that

defendant was guilty of the crime. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].)" (70 Cal.2d at p. 358.)

We have no doubt that when circumstances fall sufficiently within this pronouncement's terms, its application is both evident and salutary. We likewise have no doubt, however, that "we cannot look merely to a formula for probable cause; we must examine the elements of this case in context." (*People* v. *Curtis, supra,* at p. 358.) Here it was sufficiently clear that to the arresting officer a shooting had occurred at a precise location at an early morning hour when pedestrian traffic would be minimal. He had been informed by official radio dispatch and by the concurring advice of Golob concerning circumstances consistent with the flight of the assailant. He had been supplied from both sources particular identification indicia which included at least one unusual item (the cap) and which in combination made rational the officer's belief appellant was guilty of the crime. *Curtis* and *Mickelson* should not be understood as standing for the proposition identification data furnished to a police officer can never alone be sufficient to justify a warrantless arrest unless there could *not* have been anyone other than the person arrested who could have fit the description. Rather, the question is one of degree. And when identification information of the kind here present is buttressed by additional probative evidence of complicity, it cannot be maintained probable cause was lacking.

Appellant's assertion of error in that evidence obtained through interrogation of appellant should have been suppressed rests on the authority of *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]. In that case the Supreme Court reasoned:

"In this case we are called upon to decide whether a minor's request to see his parents 'reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time.*' (*People* v. *Randall, supra,* 1 Cal.3d 948, 956 [83 Cal.Rptr. 658, 464 P.2d 114].) It appears to us most likely and most normal that a minor who wants help on how to conduct himself with the police and wishes to indicate that he does not want to proceed without such help would express such desire by requesting to see his parents. For adults, removed from the protective ambit of parental guidance, the desire for help naturally manifests in a request for an attorney. For minors, it would seem that the desire for help naturally manifests in a request for parents. It would certainly severely restrict the 'protective

devices' required by *Miranda* in cases where the suspects are minors if the only call for help which is to be deemed an invocation of the privilege is the call for an attorney. It is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance and it is unrealistic to attribute no significance to his call for help from the only person to whom he normally looks—a parent or guardian. It is common knowledge that this is the normal reaction of a youthful suspect who finds himself in trouble with the law.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Similarly here we are not disposed to assume as a general matter that a request by a minor at or near the inception of interrogation to see his parents is not an indication of that minor's unwillingness to continue talking with police or of a desire for help in how to conduct himself with police and thus not a manifestation of that minor's intention to assert his privilege. Therefore, the People have the burden of affirmatively demonstrating that such was not the desire on the part of defendant. Here, the People did not meet this burden." (*People* v. *Burton, supra,* 6 Cal.3d at pp. 382-383.)

Here the only testimony pertinent to appellant's contention was that of one of the interrogating officers, viz.:

"Q. Did he ask you whether he wanted to see his mother (*sic*)?

"A. No.

"Q. He asked you to bring his mother in?

"A. No, he did not ask me that.

"Q. What—

"A. He said, either Louie asked me if he could call his mother, or I asked him if he wanted to talk to his mother.

"Customarily, Sergeant Munoz and I always have a parent or parents in when we interrogate a juvenile.

"I did call his mother, and I don't specifically remember, Mr. Beylen, whether it was because I wanted to talk to her. In fact, I think that I did.

"When I talked to her, I told her that we had Louie in custody and asked her if she wanted to come to the station to see him.

"Q. Getting back to what Louie told you or you told Louie—

"A. All right.

"Q. —Louis. Is it your statement, sir, that he asked to see his mother?

"A. No. I think he asked if he could talk to his mother.

"Q. Okay. And then you called his mother; is that right?

"A. Like I say, I'm not sure now. I'm not positive whether he asked me or whether I asked him whether he wanted to talk to his mother. I don't remember how that went, but I recall that because of that conversation, I did in fact call his mother.

"Q. BY MR. BEYLEN [Counsel for appellant]: Officer, what exactly did Louis tell you regarding a parent approximately at 6:45 a.m. on May 3, 1977, if you can recall?

"A. When Sergeant Munoz brought him from the back to the Detective Bureau, either Louie said he wanted to call his mother, or I suggested to him or told him, 'Do you want to call your mother?' I don't know which way it was. I do know that I did call his mother. He didn't ask that she be there.

"Q. He said he wanted to call his mother?

"A. He wanted to call his mother or talk to his mother. Call her is what I think he said."

■ On the basis of this meager record pertaining to the point, we are constrained to accept that *Burton, supra,* 6 Cal.3d 375, is controlling since its holding that ". . . when, as in the instant case, a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege. The police must cease custodial interrogation immediately upon exercise of the privilege."

*(People* v. *Burton, supra,* 6 Cal.3d at pp. 383-384; see also *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]) cannot fairly be read in any fashion other than that when a minor requests contact of any sort with a parent the burden is on the prosecution to show he did not thereby invoke his privilege against self-incrimination.[2]

Having so concluded, however, it is not yet the result the conviction must be reversed, since no confession was elicited from respondent. *(People* v. *Randall, supra.)* Resolution must depend upon whether, if the evidence derived from appellant's interrogations had been suppressed, there remained sufficient evidence to support a determination of guilt. It seems to us such is the case.

The only evidence which upon the record linked appellant to the disabled vehicle and thus pointed clearly to a motive for and connection with his presence at the gas station came from appellant's attempted alibi that he had been with the automobile's owner in some fashion as he apparently hoped would remove him from suspicion of the crime charged against him. While it is true the question of the alibi was discussed fully upon the interrogations of appellant, the tape recording of the interviews clearly discloses the information supplied in that regard had already been given by appellant at the time of his arrest. As a result, police officers were able to establish a completed sequence of events, which as summarized by the trial court, led to the conclusion of his guilt.

"THE COURT: Yes, yes.

"In a court trial, I would grant your motion were I not convinced beyond a reasonable doubt.

"I am. It is inconceivable to me that anyone in this young man's position, in his friend's car, running out of gas with money in his pocket, wouldn't try to get to a gas station and take the gas back and drive the car on.

---

[2]In argument concerning the fact appellant's mother refused to speak to her son when phoned by the interrogating officer, the following colloquy occurred between counsel for appellant and the trial court: [¶] "Assuming, for the sake of argument, that we didn't have a minor involved here, and we had an adult defendant who says, 'I want to talk to an attorney,' and he gives the officer the attorney's name. [¶] The officer calls that attorney, and the attorney says, 'That no good so-and-so, he never paid me. I don't want to talk to him.' [¶] THE COURT: Then the officer has to get a public defender."

The question never asked by counsel was what would be the result if no public defender were obtained prior to the questioning.

"I'm certain that's exactly what he did:

"He went to the Arco station, and he's the fellow that was running from it and the fellow that was seen running from the Arco side of the freeway, across the freeway.

"The possibility of two people dressed like him, one of them utterly innocent and wandering aimlessly away from a stranded car and somebody else, also on foot, who actually did it, being in the same neighborhood at the same time, and he's the only one found, doesn't appeal to my sense of probabilities at all.

"Certainly, it is unfortunate and dumb to get into an altercation with somebody in a gas station and use a gun when your only transportation is stuck up there on the freeway.

"A car that is going to attract attention will probably lead to you sooner or later. But then, we don't get too many Rhoades scholar candidates in this position. No.

"It just has to be the way this turns, . . ."

Had it not been for the connection of appellant to the disabled vehicle, the remaining evidence would have shown no more than his presence and arrest near the scene of the crime, the fact his clothing closely resembled that of a man seen running from the gas station and his possession of $35 in cash. This alone would not in our judgment have been sufficient for conviction. But when aided by evidence clearly linking appellant to the car, under circumstances which reasonably would have led to his presence at the gas station, the elements implicating him in the crime are manifestly buttressed to provide a factual foundation more than adequate for the result of conviction.

The orders appealed from are affirmed.

Fleming, J., and Beach, J., concurred.

A petition for a rehearing was denied November 14, 1978.