Filed 9/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>ANTHONY MORALES,<br><br>        Defendant and Appellant. | A159825<br><br>(Alameda County<br>Super. Ct. No. 18CR019843) |

A jury convicted Anthony Morales of second degree murder for stabbing Eric McMillian outside a Greyhound station in Oakland. Morales contends the evidence was insufficient to support his conviction. He also argues the trial court erred by improperly instructing the jury on self-defense and imperfect self-defense and denying an instruction on voluntary intoxication. We disagree and shall affirm.

### BACKGROUND

In his youth in Watsonville, Morales had associated with gang members. He later distanced himself from the gang and, as a result, gang members had assaulted him and stabbed him twice. Morales testified against a gang member related to one of the stabbings and in exchange was placed in a witness protection program in Oregon.

One day in December 2018, Morales was in Oakland waiting for a Greyhound bus to visit his family. His only luggage was a backpack that contained, among other things, a seven and a half inch kitchen

1

knife. Morales also had a butterfly knife in his pocket. Morales carried the weapons for self-defense.

Morales arrived in Oakland at noon. When he tried to board a bus in the afternoon, Morales got into a fight with the bus station staff. Morales had persisted in trying to get on the wrong bus despite the staff telling him he had the wrong ticket. The police arrived in response to a call and spoke to Morales, but they took no action because the security guard did not want to press charges.

Morales testified that he kept his backpack on his shoulder unless he was inside, because he didn't want anyone to take his belongings while he was at the station. However, the Greyhound station's security cameras showed that around 8:30 p.m. he stood on the sidewalk in front of the station for at least five minutes with his backpack at his feet.

Later that night, around 9:00 p.m., Morales left the station with an unidentified man wearing a beanie hat and walked along the sidewalk towards the parking lot on the side of the building. Morales testified that the two went to the parking lot so Morales could smoke a cigarette and the other man could use a vape with marijuana. The Greyhound station's video security cameras captured the two men walking on the sidewalk in front of the building, but the area of the parking lot where the men stood was not visible to the security cameras.

Less than 15 seconds after arriving at the parking lot, the man with the hat returned to the sidewalk in front of the bus station, while Morales stayed on the side of the building. Thirty seconds after that, McMillian walked by and stepped around the corner of the building

into the parking lot out of view of the camera. McMillian was wearing shorts, a coat, and a red hoodie. McMillian usually carried a backpack or bag of some sort when he left his apartment, but at this point he was carrying only a bicycle wheel.

According to Morales, McMillian was taller and bigger than he. McMillian asked Morales for a cigarette. Morales responded that he did not have another but offered to give McMillian some change. McMillian seemed to take offense to Morales' offer of change and said, "If I want your shit, I'll take your shit." Feeling threatened, Morales said McMillian could not take any of Morales' possessions, and Morales took a step backward and turned to get away. As he was turning, Morales felt McMillian's fingers rake across his shoulder and pull on his backpack. The force pulled Morales back around, and he saw that McMillian was now holding his backpack. Morales also felt McMillian brush against him, so Morales pushed McMillian.

Morales testified that he then backed out of the parking lot onto the sidewalk at the corner of the station and McMillian walked toward him. The security camera captured Morales as he backed onto the sidewalk without his backpack, about 40 seconds after McMillian stepped off the sidewalk into the parking lot. Morales said he walked back towards McMillian and demanded his backpack, then backed away again when McMillian did not return it.

According to Morales, McMillian then said, "What else you got?" Believing McMillian was trying to take his cell phone and wallet, Morales lifted his shirt to reveal a knife in the waistband of his pants. Morales drew the knife, held it with the blade against his forearm, and raised his arm across his chest. Morales leaned back, and it seemed to

3

him that McMillian was moving closer to take the knife, so Morales said he lashed out by extending his arm straight. Based on a later autopsy, Morales drove his knife five and a half inches into McMillian's torso.

At the time of the stabbing, the two men were on the edge of the video taken from the security camera and the details of the scene are somewhat difficult to make out. The video does not show Morales lifting his shirt and it is difficult to tell when he drew the knife. But the video does show that less than 15 seconds after Morales backed onto the sidewalk, he stepped forward toward McMillian and, in a backhanded motion, stabbed at McMillian with a knife. McMillian's arms were at his sides. Morales admitted that McMillian never drew a weapon, did not verbally threaten him, and never took a swing at him.

According to Morales, after stabbing McMillian he tried to get his backpack, but McMillian walked towards him swinging punches. McMillian fell down, got back up, picked up the backpack and bicycle wheel, and started swinging the wheel at Morales to keep Morales away. McMillian then walked quickly away, and Morales did not pursue him. These interactions were mostly out of view of the security camera, though the video reflects portions of them. Raymond Price, who had exited the building and witnessed some of these interactions after the stabbing, testified that Morales appeared to be the aggressor attacking McMillian, while McMillian was saying "Hey, man," shielding himself, and trying to get away.

McMillian walked from the parking lot to his nearby apartment building, dripping blood on the sidewalk. With blood pouring out from his shirt, he asked the front desk clerk to call 911. He asked another

4

resident of the building to take the bicycle wheel and Morales' backpack up to the resident's room. While waiting for first responders, McMillian said he had been robbed by a Mexican. McMillian was then taken to the hospital where he died from his injuries.

Morales meanwhile dropped his knife at the corner of the parking lot. Morales then ran away from the sidewalk, alongside the building, through the parking lot. He testified that he ran to get the security guard at the bus loading area in the back of the building but turned back in the parking lot when he encountered a plastic fence blocking the bus loading area. The cameras show him running through the parking lot alongside the building and turning back, but they do not show any fence. Morales then smoked a cigarette in the front of the building and went inside. The police detained Morales at the bus station shortly afterwards.

The autopsy showed that McMillian's blood tested positive for cocaine, methadone, and a very low level of marijuana, as well as metabolites of those substances. The pathologist explained that cocaine can cause agitation, alertness, increased heart rate and blood pressure, and sweating. The cocaine level in McMillian's blood was significant but not necessarily fatal, especially because the presence of significant amounts of cocaine metabolite suggested he was a chronic user. For the same reason, McMillian may have had more of a tolerance and not been exhibiting the effects of cocaine as acutely as someone who had never used the drug before. The stab wound in McMillian's abdomen penetrated his stomach and liver and was the cause of his death. McMillian had abrasions on his knees consistent with falling on concrete. McMillian also had a superficial cut on the side of his thumb

towards the end from the knuckle, which could have been caused by him trying to grab a knife but was more likely a defensive wound.

Morales had blood drawn at the police station, and his blood tested positive for methamphetamine and an antidepressant drug but not amphetamine. The effects of methamphetamine are similar to cocaine and include agitation, sweating, high blood pressure, as well as some level of psychosis, confusion, and aggression. The pathologist stated that methamphetamine is metabolized to amphetamine between 1 and 12 hours after use, so the amount of methamphetamine in Morales' blood without any amphetamine was consistent with acute intoxication and indicated the methamphetamine had been recently taken.

The pathologist told the jury that both cocaine and methamphetamine can cause a condition called excited delirium. Excited delirium consists of excitement or agitation like a fight or flight reaction, and people with the condition will get agitated and can be physically violent against things or people. People experiencing excited delirium are also not responding appropriately to stimuli and may not understand instructions, may make growling or unintelligible sounds, and fight in an aggressive, desperate way with superhuman strength. The state may end in exhaustion or death. The aggression of a person in excited delirium can arise because the person has paranoia and thinks people are coming after them. Although the levels of cocaine in McMillian's blood were consistent with a state of excited delirium, without a description of McMillian's behavior, they were not sufficient for the pathologist to say whether they caused McMillian to be in a state of excited delirium.

A psychologist, Dr. Laeeq Evered, testified for the defense that Morales had significant post-traumatic stress disorder (PTSD) from his prior experiences with gangs and being stabbed. Dr. Evered opined that if a person with significant PTSD were robbed in the dark in a strange place, the event would be likely to trigger a fear response of freeze, then fight or flight. A person with such a response would typically have poor memory of the details of the incident, and as a result might make up a story to explain the incident, perhaps by watching a video of the incident, while believing the confabulated memory to be true. Dr. Evered admitted that people with PTSD do not always have a fear response to triggering events and that it was hard to know whether a person was acting out of a fear-based PTSD response or deciding to stab someone. Dr. Evered also acknowledged that people with PTSD can get angry and act for reasons other than a fear response.

After a trial in July 2019, the jury found Morales not guilty of first degree murder but could not reach a verdict regarding second degree murder, voluntary manslaughter, and involuntary manslaughter. The trial court declared a mistrial. After a second trial in December 2019, the jury deliberated for about 17 hours over four days before finding Morales guilty of second degree murder and finding true the allegation that he used a knife. The trial court sentenced Morales to 16 years to life in prison.

## DISCUSSION

### I. Sufficiency of the evidence

Morales contends the evidence was not sufficient to support his conviction for second degree murder. "Second degree murder is the

7

unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 368; Pen. Code,[1] § 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) The Supreme Court has "interpreted implied malice as having 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Because Morales testified that he killed McMillian in self-defense, the prosecution was also required to prove he did not act in self-defense or imperfect self-defense. (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1158–1159 [prosecution required to disprove justifications or excuses]; *In re Walker* (2007) 147 Cal.App.4th 533, 537 [prosecution required to disprove imperfect self-defense].) Under the doctrine of self-defense, "a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend." (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) Under the doctrine of imperfect self-defense, "[a]n unlawful killing involving

---

[1] Undesignated statutory citations are to the Penal Code.

8

either an intent to kill or a conscious disregard for life constitutes voluntary manslaughter, rather than murder, when the defendant acts upon an actual but unreasonable belief in the need for self-defense." (*Ibid.*)

"Given this court's limited role on appeal, [Morales] bears an enormous burden in claiming there was insufficient evidence to sustain his conviction." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

In his opening brief, Morales contends the evidence supporting his conviction is insufficient because (1) there was not enough evidence that he intended to kill McMillian, (2) the undisputed evidence of his PTSD precluded a finding that he acted with a conscious disregard for the dangerousness of his actions, and (3) the prosecution failed to prove he was not acting in imperfect self-defense. In his reply brief, however, Morales abandons the first argument by conceding that the evidence that he struck first and used a knife to stab at McMillian's abdomen, among other things, supports a finding that he intended to kill. He nonetheless insists this evidence was insufficient under his third argument because the evidence shows his mental state was impacted by a fear of McMillian's robbery.

As the Attorney General points out, however, the jury was free to disbelieve Morales' claim that he was afraid and acting in self-defense, especially in light of the evidence to the contrary. (*People v. Webb* (1978) 83 Cal.App.3d 83, 94–95.) Morales admitted that he lashed out at McMillian with a seven-inch knife with sufficient force to penetrate five and a half inches into McMillian's abdomen. Price testified that immediately after the stabbing Morales was the aggressor and McMillian was trying to get away. The pathologist testified that McMillian had a defensive wound on his thumb. The jury also saw the video of the stabbing, which shows that Morales wound up for his killing stroke by leaning back and then stepped forward to McMillian,

10

purposefully driving his knife straight towards McMillian's abdomen. During the moments immediately preceding the stabbing, McMillian did not appear to be menacing or threatening Morales, and McMillian's arms never left his sides. The jury had a sufficient basis from which to conclude Morales intended to kill and was not acting in self-defense or imperfect self-defense.[2]

Morales' argument regarding implied malice and his PTSD evidence likewise falls short. Morales points out that Dr. Evered's testimony that Morales suffered from PTSD was undisputed. Dr. Evered told the jury that if Morales were experiencing a fear response triggered by his PTSD, Morales would have been unable to consciously consider the risk to McMillian's life from Morales' actions. Morales argues no reasonable jury could conclude from this evidence that Morales was aware that his actions were dangerous and consciously disregarded the risk.[3]

Morales cites no authority for his apparent assumption that the jury was required to accept Dr. Evered's testimony about Morales' PTSD. Such an assumption is contrary to the instruction to the jury,

---

[2] Morales argues the jury verdict cannot be construed as a rejection of his claim of self-defense because of his separate argument that the jury was not properly instructed that self-defense applies in cases of robbery. We reject this claim of instructional error for the reasons set out below.

[3] Morales also mentions the evidence of his methamphetamine intoxication in support of his argument regarding implied malice. But as we discuss in further detail below in response to Morales' argument regarding his request for an instruction on voluntary intoxication, evidence of voluntary intoxication cannot be used to disprove implied malice. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1376; § 29.4, subds. (a)–(b).)

which Morales does not challenge, that the jury could believe all, part, or none of any witness's testimony.  (See CALCRIM No. 226; see also, e.g., *People v. Carrington* (2009) 47 Cal.4th 145, 187 [jury was free to disbelieve defendant's claim that she formed specific intent to rob victim only after shooting him].)  Assuming the jury did believe Dr. Evered's testimony on these points, the jury could still decide that Morales had implied malice despite the PTSD diagnosis.  Dr. Evered admitted that people with PTSD can act for reasons other than their PTSD, even in triggering situations.  The jury could watch the video of Morales' actions and conclude from Morales' behavior and actions on the video that he was not acting based on fear or PTSD at the time of the stabbing, despite his and Dr. Evered's testimony to the contrary. We cannot gainsay the jury's conclusion in this regard.

## II.    Instruction on self-defense to robbery

"We review a claim of instructional error de novo.  [Citation.] 'Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." ' " (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.)  "Generally, the trial court is required to instruct the jury on the general principles of law that are closely and openly connected with the evidence and that are necessary to the jury's understanding of the case.  [Citation.]  It also has a duty to refrain from giving incorrect instructions or instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*Id.* at p. 799.)

The trial court instructed the jury in accordance with CALCRIM No. 505 that Morales acted in lawful self-defense if (1) he reasonably

12

believed that he was in imminent danger of being killed or suffering great bodily injury, (2) he reasonably believed that the immediate use of deadly force was necessary to defend against that danger, and (3) he used no more force than was reasonably necessary. Morales asked the trial court to modify the first element to include, apart from the imminent danger of being killed or suffering great bodily injury, an imminent danger of being robbed or maimed. The trial court denied Morales' requested instruction, telling Morales' counsel that he could discuss robbery in his argument concerning the concepts of danger of great bodily injury or death, but that the danger had to be one of imminent death or great bodily injury.

Morales contends the trial court erred by denying his request to add an imminent danger of robbery as a sufficient basis for the first element of self-defense because his own testimony provided ample evidence that McMillian was committing a robbery. He argues the trial court mistakenly believed that self-defense was available only to respond to a danger of great bodily injury or death. He relies primarily on section 197, as construed in *People v. Ceballos* (1974) 12 Cal.3d 470 (*Ceballos*).

Section 197 provides that homicide is justifiable "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person" or "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony." (§ 197, subds. (1)–(2).) *Ceballos*, *supra*, 12 Cal.3d at pages 477–478, limited the meaning of "felony" in these subdivisions because there are far more felonies under modern criminal law than at early common law,

13

and many modern felonies do not involve a danger of serious bodily harm. Following and expanding on *People v. Jones* (1961) 191 Cal.App.2d 478, 481–482, *Ceballos* therefore read section 197 as permitting the use of deadly force to prevent a felony only if the felony is "forcible and atrocious." (*Ceballos*, at p. 478.) *Ceballos* then remarked, "Examples of forcible and atrocious crimes are murder, mayhem, rape and robbery. (See *Storey v. State* [(1882)] 71 Ala. 329, 340; 3 Greenleaf on Evidence (1899) p. 122.) In such crimes 'from their atrocity and violence human life [(]or personal safety from great harm[)] either is, or is presumed to be, in peril.' " (*Ceballos,* at pp. 478–479.) *Ceballos* went on to hold that even though burglary had also been considered a forcible and atrocious crime, because burglary had a wide scope, not all burglaries would trigger the right to use deadly force in self-defense. (*Id*. at p. 479.) *Ceballos* therefore held that a defendant who killed two burglars with a trap gun, when the defendant was not on the property when it was burglarized, could not claim self-defense. (*Id*. at pp. 479–480.)

Relying on *Ceballos*, Morales argues that the evidence that he was resisting McMillian's attempt to rob him was itself a sufficient basis for his requested instruction without regard to any danger of great bodily injury or death. Morales notes that CALCRIM No. 505, based on *Ceballos*, provides bracketed language in the first element of the self-defense instruction to allow a jury to find that element is satisfied if a defendant reasonably believed the defendant was in imminent danger of death, great bodily injury, or being raped, maimed, or robbed. CALCRIM No. 505 further states in a bench note, "If the defendant is asserting that he or she was resisting the commission of

14

one of these felonies or another specific felony, the court should include the bracketed language at the end of element 1 and select 'raped,' 'maimed,' or 'robbed,' or insert another appropriate forcible and atrocious crime. In all other cases involving death or great bodily injury, the court should use element 1 without the bracketed language." Morales also cites *People v. Young* (1963) 214 Cal.App.2d 641, 644, fn. 2, 650 (*Young*), which reversed a conviction because the trial court failed to instruct the jury that homicide is justifiable when resisting an attempt to murder, commit a felony, or do great bodily injury.

 *Young* and *Ceballos* notwithstanding, we are not convinced that a mere robbery, without more, will give rise to the right of self-defense with deadly force. *Young* predated *Ceballos* and its restriction of section 197 to forcible and atrocious felonies, so it is not helpful. Using *Ceballos*' terminology, we conclude that robberies are not always forcible and atrocious, as they cover a wide scope of conduct. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) But the degree of force involved is immaterial, and can be satisfied by wresting a purse from someone unwilling to part with it and stepping on her foot (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1259), or even by politely tapping a person on the shoulder to indicate that she should step aside from a cash register (*People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246, disapproved of on other grounds by *People v. Mosby* (2004) 33 Cal.4th 353). Where a robbery is accomplished through fear, meanwhile, the fear need not pertain to physical safety at all and can be a fear of injury to property. (§ 212.) A robbery therefore cannot

trigger the right to use deadly force in self-defense unless the circumstances of the robbery gave rise to a reasonable belief that the victim would suffer great bodily injury or death. To be sure, many robberies likely satisfy that standard, since, for example, a victim who surrenders property in response to the brandishing of a weapon or what appears to be a deadly weapon could reasonably fear that the robber would use it. (See, e.g., *People v. Villa* (2007) 157 Cal.App.4th 1429, 1433 [pointing a metallic object that appeared to be a gun induced fear in victims and satisfied the fear element of robbery].) But the touchstone for self-defense remains the reasonable belief of the danger of great bodily injury or death, not the threat of a robbery in and of itself.

*Ceballos*' remark that robbery is a forcible and atrocious crime does not convince us otherwise. *Ceballos* itself did not involve a robbery, so the remark is dicta. Further, treating all robberies as forcible and atrocious crimes would be at odds with *Ceballos*' approach of examining whether the character and manner of the burglary at issue there threatened or could be reasonably believed to threaten death or serious bodily harm. (*Ceballos*, *supra*, 12 Cal.3d at p. 479.) The corresponding instruction in another set of jury instructions, CALJIC Crim. 5.16, also states that robbery is a forcible and atrocious crime, based on *Ceballos*. But as the use note for that instruction explains, *Ceballos* "relied upon an old Alabama case and an 1899 evidence text, and those authors obviously had in mind the traditional common law robbery. Since *Ceballos*, other cases have expanded robbery to include situations where very little force or threat of force is involved. In addition, some unarmed robberies would not meet the

16

definition of forcible and atrocious. Bearing in mind that in *Ceballos*, the court was postulating a rule of reasonableness, it is suggested that if the trial court is in doubt whether the crime the victim was engaged in was in fact forcible and atrocious, using the first paragraph of the instruction alone [concerning the threat of great bodily injury or death] would permit the jury to determine appropriately the merits of the alleged defense."

The suggestion in this use note is sensible. As the court remarked in *People v. Jones, supra*, 191 Cal.App.2d at page 482 (on which *Ceballos* relied), "Any civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of apparent absolute necessity." For that reason, to determine whether a person who fears being the victim of a crime may respond with deadly force, "[w]e must look further into the character of the crime, and the manner of its perpetration," prohibiting the use of deadly force when the character and manner of the crime "do not reasonably create a fear of great bodily harm." (*Ibid.*) The use of deadly force is not necessary to prevent a robbery that is little more than a purse snatching or to prevent harm to the purse. Neither the Legislature nor *Ceballos* can have intended to permit the victim of a robbery to use deadly force in such situations.

In his reply brief, Morales advances a narrower argument that his requested robbery instruction was necessary for the jury's understanding of the case because robbery can be accomplished by instilling fear of bodily injury and that was the basis for his claim of self-defense. He believes the jury could not put these points together, because it was only told that Morales could resist an imminent attack,

17

not that he could use force to defend himself if he believed he was having property taken by use of fear of physical attack.  His maintains the jury should have been told how the fear of great bodily injury in the context of a robbery applied to the concept of self-defense.

This argument has no more merit than Morales' first position.  Preliminarily, this theory does not match the instruction Morales requested in the trial court, which presented fear of robbery as an alternative basis for self-defense to fear of great bodily injury or death, not as a contributing factor to the fear of great bodily injury or death.  More importantly, the jury did not need to be instructed on self-defense in the context of a robbery.  Because the trial court told the jury that Morales could use deadly force in self-defense if he reasonably feared an imminent attack that might result in death or great bodily injury, it was unnecessary to go further and say he could use deadly force in self-defense if he reasonably feared such an imminent attack as part of a robbery.  The instruction the trial court delivered thus necessarily encompassed the theory Morales advanced.  The key question for the purposes of self-defense is not an attacker's motive for attacking, but the sincerity and reasonableness of Morales' belief of an imminent attack.  "In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. [Citation.]  ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' "  (*People v. Barber*, *supra*, 55 Cal.App.5th at pp. 798–799.)  Considering

18

the instructions as a whole, the jury could evaluate Morales' theory using the instructions the trial court provided.

Even if the trial court should have provided an instruction on the narrow theory that Morales advances in his reply brief, the error was harmless under either the federal or state standards. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199 [California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"]; *People v. Barber, supra*, 55 Cal.App.5th at p. 799 [error in refusing to give a requested pinpoint instruction is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836].)  As Morales admits, his defense focused on making the robbery a part of the basis for Morales' claim of fear.  He raised the robbery and his resulting fear numerous times in his testimony.  His counsel raised the robbery theory several times in closing argument as well.  The jury nonetheless chose to convict Morales of second degree murder.  This indicates that the jury did not accept Morales' claims that he used deadly force because of a genuine and reasonable fear that McMillian would inflict great bodily injury or kill him.  Adding an additional instruction that Morales could have acted in self-defense if he had a fear of great bodily injury or death due to robbery would not have changed the jury's finding on this point.

## III.    Instruction on imperfect self-defense

Morales next challenges the trial court's instruction on voluntary manslaughter based on imperfect self-defense.[4]  In addition to

---

[4] Morales did not object to this instruction below, but we may review his argument here that the instruction was an incorrect

19

instructing the jury on self-defense in accordance with CALCRIM No. 505, the trial court instructed the jury using CALCRIM No. 571. That instruction states that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant kills because of imperfect self-defense.  It further states that a defendant acts in imperfect self-defense if a defendant (1) actually believes that he or she is in imminent danger of being killed or suffering great bodily injury and (2) actually believes that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable.

Morales contends this instruction was insufficient because it failed to tell the jury that a homicide also qualifies as voluntary manslaughter and not murder when a defendant's beliefs in danger and the need to use deadly force are reasonable but the sort of deadly force he uses is excessive and more than necessary to repel the attack.  He argues that if the jury found he reasonably believed he would suffer great bodily injury from McMillian in the course of the robbery and reasonably believed he needed to arm himself against McMillian, but found that stabbing McMillian in the abdomen was more force than was reasonably necessary, the jury could find him guilty of voluntary manslaughter.

Our Supreme Court has made clear that "not every unreasonable belief will support a claim of imperfect self-defense"; rather, a

---

statement of the law if the instruction affected his substantial rights, meaning it was reversible error under *People v. Watson*, *supra*, 46 Cal.2d at p. 836.  (§ 1259; *People v. Christopher* (2006) 137 Cal.App.4th 418, 427; *People v. Rivera* (1984) 162 Cal.App.3d 141, 146.)

defendant can claim imperfect self-defense based only on a belief "that, if reasonable, would support a claim of perfect self-defense." (*People v. Valencia* (2008) 43 Cal.4th 268, 288.) For example, if a defendant unreasonably believes someone is going to punch him in the arm and stabs him to death in response, "this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force." (*Id.* at p. 288, fn. 6.) In such a scenario, the use of force would be excessive but still would not reduce a homicide to voluntary manslaughter. Similarly here, if Morales reasonably believed he needed to use force against McMillian but used more force than was necessary, then he could not claim perfect self-defense. As a result, he cannot claim imperfect self-defense, either.

Moreover, Morales does not explain how his stabbing could be based on his reasonable belief in the need to use of *deadly* force but still qualify as *excessive*.[5] If Morales reasonably believed he needed to use deadly force to prevent McMillian from harming him, his use of a single stab with his knife would appear to be reasonable. (Cf. *Young*, *supra*, 214 Cal.App.2d at pp. 649–650 [deadly force would be excessive if defendant chased victim as victim ran away from fight and stabbed him after he was lying on the ground].) Morales also cites no authority for his position that one type of deadly force could be reasonable but

_____

[5] To the extent Morales is making the related argument that the instructions failed to inform the jury that he would be guilty only of voluntary manslaughter if he had a sincere, but unreasonable, belief in the need to use deadly force, we reject this claim as well. The instructions informed the jury of precisely this point, and in any event, if Morales' sincere belief in the need to use deadly force was unreasonable, then by definition the use of deadly force would be excessive.

21

another could be excessive.  The relevant consideration is whether a defendant uses more force than is necessary to repel an attack, not the type of deadly force used by a defendant.  (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630.)

Morales further argues that the trial court should have instructed the jury that malice would be negated if they found that Morales killed out of an honest belief in the need to defend himself but used excessive force..  Morales is correct that imperfect self-defense converts a homicide from murder to voluntary manslaughter because it negates the element of malice.  (*People v. Mayfield*,  (1997) 14 Cal.4th 668, 777–778, abrogated on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)  But the negation of malice is immaterial for the purposes of the jury.  *Mayfield* did not hold, as Morales contends, that the jury necessarily had to be instructed on how imperfect self-defense impacts the concept of malice.  (*Ibid.*)  Although the instruction in *Mayfield* did explain that imperfect self-defense negated malice, *Mayfield* found the instruction there sufficient because it made clear that the question of whether an imperfect self-defense theory will preclude a murder conviction turns on the jury's assessment of whether the defendant's belief in the need to use deadly force was sincere, even if unreasonable.  (*Ibid.*)  So, too, the instruction here.

*People v. Genovese* (2008) 168 Cal.App.4th 817, 832, rejected the argument Morales now advances.  Like Morales, Genovese contended that the jury instructions erroneously failed to inform the jury that imperfect self-defense eliminates malice.  (*Id.* at p. 825.)  The court held that "it does not matter that the [] instructions failed to inform the jury that imperfect defense of another would eliminate malice," explaining

22

that Genovese's "argument is defeated by the plain language of the instructions as given to the jury, that '[a] killing that would otherwise be murder is reduced to voluntary manslaughter' if defendant acted in imperfect defense." (*Id.* at pp. 830–831, 832.) As a result, it was "immaterial that the jury was not informed that, in fact, what was going on was that the jury was finding an 'absence of malice.' . . . The definition of malice may be interesting to lawyers and judges and law professors, but it does not aid the task of lay jurors to inform them that, when the defendant acts in an honest but unreasonable belief in the need to defend another, he is acting without malice." (*Id.* at p. 831.) The jury in Morales' trial received the same instruction. Like the *Genovese* court, we find that this instruction adequately explained that Morales would be guilty of voluntary manslaughter if he acted in imperfect self-defense, even if the jury found he had an intent to kill or a conscious disregard for the danger of his actions. (*Ibid.*) We presume the jury followed this instruction, despite not being told the underlying legal rationale that the reduction of murder to voluntary manslaughter would occur via the mechanism of negating malice. (*People v. Barber*, *supra*, 55 Cal.App.5th at p. 799 [" 'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions' "].)

## IV. Failure to instruct on voluntary intoxication

Morales finally argues the trial court should have delivered an instruction on voluntary intoxication. In the context of second degree murder, evidence of a defendant's voluntary intoxication can negate a finding that he harbored express malice, which is defined in section 188 as an intent to kill unlawfully. (*People v. Turk*, *supra*, 164 Cal.App.4th

23

at pp. 1376–1378; § 29.4, subd. (b); see *People v. Soto* (2018) 4 Cal.5th 968, 975.) However, voluntary intoxication cannot negate a finding of implied malice. (*Turk*, at p. 1376 ["a defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice, which voluntary intoxication cannot negate"]; *Soto*, at p. 977 ["By prohibiting evidence of voluntary intoxication to negate implied malice, the Legislature apparently [intended] that a defendant who acts with conscious disregard for life should be punished for murder regardless of whether voluntary intoxication impaired his or her judgment"]; § 29.4, subds. (a)–(b).) A defendant is therefore entitled to an instruction on voluntary intoxication "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

Morales asked the court to deliver CALCRIM No. 625, which defines voluntary intoxication and as relevant here states that a jury may consider voluntary intoxication for the limited purpose of deciding whether a defendant acted with the intent to kill. The trial court denied Morales' request, stating, "No one touched upon that. No one even asked him about -- you know, you have the doctor talk about the methamphetamine issue and then how within six hours it would process itself. It hadn't processed itself. So it's within the window, but

24

nobody talked about that. Nobody asked that question. So that's the question. I'm sitting here waiting and it didn't happen."

We agree with the trial court that the evidence here was insufficient to warrant an instruction on voluntary intoxication. Morales focuses on the testimony of the pathologist that Morales' blood tested positive for methamphetamine and the absence of metabolites was "consistent with an acute intoxication." The pathologist testified that these lab results indicated that Morales had recently taken the methamphetamine, somewhere between 1 and 12 hours prior to his blood being drawn. The pathologist also explained that methamphetamine can cause agitation, sweating, high blood pressure, "even a certain level of psychosis, confusion, aggression on some levels." Additionally, the pathologist mentioned that cocaine and methamphetamine can both cause excited delirium.

What is missing from this general testimony about the effects of methamphetamine, however, is any indication that Morales' use of methamphetamine affected his thought process in any way. This absence is conspicuous, because, as the trial judge noted, Morales' counsel's questioning of the pathologist initially suggested that he intended to present a defense of voluntary intoxication. But Morales' counsel never completed the defense by presenting evidence regarding the effects of methamphetamine on Morales' formation of an intent to kill, either from the pathologist or Morales himself. Morales' counsel himself seemed to recognize this, since he described the testimony on voluntary intoxication as "limited" when he asked for the instruction. For example, Morales' counsel never asked the pathologist which of the effects of methamphetamine Morales would have exhibited given the

25

amount found in his blood, or whether any of the described effects would have prevented Morales from forming the intent to kill. Morales' counsel focused his questions to the pathologist on excited delirium as it relates to McMillian's use of cocaine and did not try to link excited delirium to the level of methamphetamine in Morales' blood. Besides, the pathologist also made clear that excited delirium cannot be diagnosed from a toxicology report alone, but instead is diagnosed based on a description of a person's conduct. Morales himself never mentioned using methamphetamine or raised any issue with respect to whether the methamphetamine affected his formation of an intent to kill McMillian. Absent such evidence, the pathologist's testimony regarding the amount of methamphetamine in Morales' blood and the general effects of methamphetamine was not sufficient to raise a reasonable doubt in the jury's mind about Morales' intent to kill. (*People v. Salas*, *supra*, 37 Cal.4th at p. 982.)

This case is similar in this regard to *People v. Williams*, *supra*, 16 Cal.4th 635. *Williams* held that even if a few isolated references to a defendant being " 'spaced out,' " " 'doped up,' " and " 'smokin' pretty tough' " qualified as evidence that the defendant was intoxicated at the time of the crime, the trial court properly denied the defendant's request for a voluntary intoxication instruction because "there was no evidence at all that voluntary intoxication had any effect on [the] defendant's ability to formulate intent." (*Id.* at pp. 677–678.) Similarly here, even if the pathologist's testimony could qualify as substantial evidence that Morales was intoxicated, in the absence of evidence that his intoxication had any effect on his formation of the intent to kill, the

26

trial court correctly refused his request for an instruction on the effects of voluntary intoxication.

In a fallback argument, Morales argues that any insufficiency of the evidence to support a voluntary intoxication instruction demonstrates his trial counsel was constitutionally insufficient. He contends that Morales' counsel's questioning of the pathologist and request for the instruction indicates that his counsel intended to lay the foundation for a voluntary intoxication defense, so that his failure to elicit the necessary testimony fell below reasonable professional standards.

"To demonstrate ineffective assistance of counsel, [Morales] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citation.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

We cannot say in this direct appeal that Morales' trial counsel was ineffective for failing to elicit the final piece of testimony regarding Morales' intoxication. Despite asking for the instruction at the end of trial, his counsel could have rationally decided earlier that it was better not to rely on Morales' use of methamphetamine for his defense.

Morales' counsel's admission that the evidence regarding voluntary intoxication was limited suggests this was in fact a tactical decision. Evidence of voluntary intoxication at most would have defeated a finding that he acted with express malice. The jury could still have convicted Morales based on a finding of implied malice. The evidence at trial supported an implied malice theory, since the jury could have concluded that thrusting a seven-inch knife towards McMillian's abdomen demonstrated Morales had a conscious disregard for McMillian's life, even if Morales did not actually intend to take his life. Morales' counsel could have reasonably concluded that the benefit from relying on Morales' methamphetamine use to defeat a finding of express malice was not worth the risk of losing the sympathy of the jury and thereby making a conviction based on an implied malice theory more likely.[6]

**DISPOSITION**

The judgment is affirmed.

BROWN, J.

I CONCUR:

TUCHER, J.[*]

*People v. Morales* (A159825)

---

[6] Because we find the trial court committed no error, we need not consider Morales' contention that the cumulative effects of multiple errors in his trial made it fundamentally unfair in violation of due process.

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

28

STREETER, Acting P. J., Concurring.

I agree with the lead opinion that the imminent danger of robbery Morales faced was not sufficient to warrant his requested pinpoint instruction on self-defense, but I am reluctant to reject his claimed entitlement to that instruction as categorically as my colleagues do.  In support of his claim of error, Morales does not suggest that "all robberies" ought to be treated as forcible and atrocious felonies as a matter of law, so I see no need to expound on whether the illustrative reference to robbery in *People v. Ceballos* (1974) 12 Cal.3d 470, 478, was dicta or not.  We should tread carefully in dealing with what may appear to be statements extraneous to the precise holding of a Supreme Court case.  (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [" 'Even if properly characterized as dictum, statements of the Supreme Court should be considered persuasive.' "].)  What Morales contends is that, on this record, there was substantial evidence to support his proposed instruction.  We need go no further than to answer that question on the specific facts of this case.

The felony-resistance defense contained in Penal Code section 197, subdivision (1), is a codification of the traditional common law felony-resistance defense.  (*People v. Ceballos*, *supra*, 12 Cal.3d at pp. 477–478; *People v. Jones* (1961) 191 Cal.App.2d 478, 481.)  Where statutes are merely codifications of the common law, we must assume they are limited by the corresponding traditional common law rules.  (*Parsley v. Superior Court* (1973) 9 Cal.3d 934, 938–939.)  Virtually all forms of the common law doctrine of justification contain an element of objective reasonableness.  (*People v. Uriarte* (1990) 223 Cal.App.3d 192, 197; see generally Note, *Justification for the Use of Force in the*

1

*Criminal Law* (1961) 13 Stan. L.Rev. 566.) An objective reasonableness requirement is therefore implied in the statutory version of the defense Morales proposed as the frame for his requested pinpoint instruction.

There is a subjective element to the defense as well. Felony-resistance is not available as an excuse or justification unless the defendant actually and reasonably believes in the need to use deadly force. "A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury. Under such circumstances, the killing is not a crime. [Citations] Where the defendant kills while actually but *unreasonably* believing the use of deadly force was necessary, defendant is considered to have acted in imperfect self-defense. Imperfect self-defense is not a complete defense to a killing, but negates the malice element and reduces the offense to voluntary manslaughter. [Citations.] 'The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend . . . against imminent peril to life or great bodily injury.'" (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744.)

Drawing inferences from the record in favor of Morales, he was an indigent person carrying all of his possessions in his backpack and he attempted to ward off an attempt to strip him by force of everything he owned. None of us has ever been in that situation, but in applying the requisite test of actually perceived peril and reasonableness, we must make an effort to put ourselves in the shoes of someone reacting to a threat so profound that it struck at the victim's fundamental sense of personal security. (Cf. *People v. Humphrey* (1996) 13 Cal.4th 1073,

1083 [in a homicide case involving an attempt to present expert testimony supporting a battered women's syndrome claim of self-defense, "[a]lthough the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which a defendant found herself."].) For a person so impoverished that he owns nothing else, there could be circumstances in which a threatened taking of property meets this test.

Even looking at things in this case through that prism, on these specific facts I conclude that the evidence is insufficient to support the requested pinpoint instruction. It does not appear to me that Morales either actually or reasonably believed that the taking of his backpack was such a serious threat to his person that deadly force was necessary to repel it. I can imagine additional circumstances showing that Morales, acting out of the sense of desperate hypervigilance that life on the streets sometimes engenders, might have perceived extreme danger where others accustomed to greater personal security would not. (See *People v. Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 745–746 [reversing first degree murder conviction based on erroneous refusal to allow testimony from expert who was prepared to explain "that individuals who are chronically homeless . . . are subjected to a high rate of violence by both housed and homeless individuals, and that the experience of living for years on the streets instills a perpetual fear of violence that would have affected defendant's belief in the need to defend himself with lethal force"].) But no such circumstances were shown here.

3

The mental-state defense in this case, put on through an expert, was that Morales, a former gang member who had cut his ties with his former gang associates and who had been beaten and attacked multiple times for doing so, suffered from severe posttraumatic stress disorder (PTSD) that was easily triggered by perceived threats. Due to his past entanglement with gang life, he was, in short, a person with a hair-trigger for violence when he came under threat. That has nothing to do with some deep sense of attachment to his belongings. Other than his gang past, there is very little in the record about Morales's life circumstances at the time of the crime. He appears to have been an indigent drifter, and he testified that his backpack contained everything he had, including clothes and medications—"all my stuff," as he put it—but the focus of his defense was solely on his heightened sense of vulnerability to physical attack based on his gang history, not on a concern about someone taking all of his "stuff" as a trigger for a PTSD-induced perpetual fear of violence.

On some other record, I would not rule out the possibility that there could be a threatened robbery sufficiently serious to qualify as a forcible and atrocious felony, but we do not have that record here. With this slight qualification, I concur fully in the opinion.

STREETER, Acting P. J.

4

Trial Court:  Alameda County Superior Court

Trial Judge:        Hon. C. Don Clay

Counsel:

Law Office of Matthew A. Siroka, Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin, Basil R. Williams, Deputy Attorneys General for Plaintiff and Respondent.