Filed 5/30/24  P. v. Martinez-Soto CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LLOBAN MARTINEZ-SOTO,<br><br>        Defendant and Appellant. | A168320<br><br>(Sonoma County Super. Ct. No. SCR7437261) |

On the afternoon of January 18, 2021, defendant Lloban Martinez-Soto shot and killed Jesus Mendez.  Martinez-Soto was subsequently convicted by a jury of second-degree murder and being a felon in possession of a firearm and sentenced to a prison term of 43 years to life.  He argues that his conviction must be reversed because the trial court committed prejudicial error in refusing his requested pinpoint instruction that he had the right to use a gun in self-defense even though he was a felon prohibited from possessing firearms and that substantial evidence does not support the jury's finding that he did not act in self-defense.  We affirm.

**BACKGROUND**

On January 18, 2021 at 2:39 p.m., several deputies with the Sonoma County Sheriff's Office were dispatched to an address on Casa Grande Road in Petaluma in response to a report of a possible homicide.  When they

1

arrived, they found Mendez lying on the ground. Mendez had four gunshot wounds: two on his torso, above his stomach and above his hip, one in his left bicep, and one in the left rear of his shoulder. The bullet that entered Mendez's left bicep fractured his ribs, punctured his aorta, went through his thoracic spine and was recovered from his right lung. The bullet that entered Mendez's left shoulder fractured the cervical vertebral body and lacerated the spinal cord, which bullet was recovered from the right shoulder armpit area. Mendez was pronounced dead at the scene at 2:56 p.m.

Deputies also found a DeWalt folding knife at the scene underneath a nearby vehicle.

On February 8, 2022, the Sonoma County District Attorney filed a first amended information charging Martinez-Soto with the first-degree murder of Mendez (Pen. Code, § 187, subd. (a))[1] (count 1) and being a felon in possession of a firearm (§ 29800, subd. (a)(1)) (count 2). The information further alleged various firearm enhancements as to count one, including that Martinez-Soto personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)).

Trial took place over approximately 11 days in February and March of 2023.

Gloria Avila testified for the prosecution that she had been dating Martinez-Soto off and on since she was 14 years old. Martinez-Soto "frequently" made accusations that Avila was cheating on him with other men, in particular with Mendez. Avila also dated Mendez for a few months around the summer of 2020. They broke up in September, after Mendez accused her of having sex with Martinez-Soto. About a month later, Avila

---

[1] Further undesignated statutory references are to the Penal Code.

2

began dating Martinez-Soto again, until a month before the shooting in December of 2020, when they separated again.  Martinez-Soto "many times" told Avila that Mendez made him angry.

In December 2020, Avila was pregnant but subsequently had a miscarriage.  She testified that Martinez-Soto "didn't believe I was pregnant with his kid."  In late December of 2020, Martinez-Soto sent Avila text messages telling her "that fucking Mendez will get his Santa Claus," that he would "impale" Mendez if he found him, and that "that fucker [Mendez] is gonna get it."

On the night of January 17, 2021, Martinez-Soto and Avila stayed at the Good Nite Inn in Rohnert Park.  That night they used methamphetamine which they had been doing for several days, and for "part of the night" were arguing.  During the night, the pair and their friend Valentino were driving around and went to Valentino's house to use the restroom.  Avila and Valentino went inside, and when they returned, Martinez-Soto was gone.

Avila and Valentino went to Oakland to pick up drugs and eventually returned to the hotel in Rohnert Park.  At 4:23 a.m., Martinez-Soto texted Avila "I have the gun."  Martinez-Soto eventually returned to the hotel room, accused Avila and Valentino of having sex, and pointed the gun at her.  In other text messages that morning, Martinez-Soto accused Avila of "being a slut with half the world," told her "[y]ou're going to pay for it," and threatened to "put lead in that idiot" with respect to another man with whom he believed Avila was having sex.

Around 9:00 a.m. on the morning of January 18, Avila's mother Teresa Saldana and Mendez were smoking methamphetamine in a hotel room.  Around 2:00 p.m., Mendez and Teresa returned to her residence, where Mendez began working on a car.

3

Paulina Saldana, Teresa's niece, lived with Jesus Ramirez in the main house on Teresa's property. Teresa lived in a separate house at the rear of the property. On January 18, Paulina and Ramirez returned home around 1:00 p.m., at which point they saw Martinez-Soto sitting in his car facing the house. Paulina went inside, and Ramirez walked to the rear of the property, passing by Mendez, who was working on a car in the driveway. A few minutes later, Ramirez heard a vehicle pull up the driveway, the car door open, a "little" screaming from Mendez, three or four gun shots, and the car door close. Ramirez went to the front of the property, where he saw Martinez-Soto backing his car out of the driveway.

Ramirez knocked on Paulina's window, and she went to the back of the property, where she saw Mendez lying face up near his car. There was a folding knife with an open blade in Mendez's right hand. Paulina saw that Mendez had been shot in the stomach and called 911 while Ramirez performed CPR. Teresa then came outside, took the knife out of Mendez's hand, and threw it towards the back of the house.

At 2:49 p.m., Sonoma County Sheriff's Deputy Randy Williams observed a vehicle matching the description of Martinez-Soto's red Saturn driving recklessly. At 2:58 p.m., Deputy Williams located the vehicle parked in an alley. He called for backup and established a perimeter. A SWAT team eventually arrived, and after an almost six-hour standoff during which the SWAT team deployed flashbangs and tear gas, Martinez-Soto finally exited the house and was arrested around 9:51 p.m. He repeatedly told police that he had been sleeping.

Dr. Kimi Verilhac, a forensic pathologist working with the Sonoma County Sheriff's Office, testified that Mendez's wounds were consistent with

4

his turning away from the shots, and that the shot that entered his left shoulder was consistent with his being shot from behind and to the left.

Martinez-Soto testified in his own defense. According to his testimony, he drove to Teresa's house to try to find Avila and his cell phone. He did not think that Mendez was at the house. As Martinez-Soto was walking up the driveway, Mendez approached him quickly and "said that it was time for me to pay the piper and he was gonna poke me." Mendez had a folding knife in his hand. Martinez-Soto backed up a little bit, drew his gun, and fired four shots at Mendez. Martinez-Soto then got into his car and reversed out of the driveway. He drove to his friend's house in Sonoma and threw the gun in a trash can. Martinez-Soto hid in the house, told the police that he had been sleeping all day, and did not tell the police that he shot Mendez in self-defense because he "was afraid. And if I had told the police, they wouldn't have believed me. I don't trust—you know, police has never helped me because—and because I was a convicted felon, so I couldn't carry weapons."

On March 21, the jury found Martinez-Soto guilty of second degree murder (§ 187, subd. (a)) (count 1) and possession of a firearm as a felon (§ 29800, subd. (a)(1)) (count 2). The jury also found true the personal firearm use allegations (§ 12022.53, subds. (b), (c), (d)). On April 13, a bifurcated court trial on the aggravating circumstances was held, with the prosecution moving to strike all the aggravating circumstances except that "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness," which circumstance the trial court found true. (Cal. Rules of Court, rule 421(b)(2).)

On June 15, the trial court sentenced Martinez-Soto to an indeterminate term of 15 years to life on count 1, with an additional

consecutive 25 years to life on the firearm use allegation (§ 12022.53, subd. (d)), consecutive to the aggravated three year determinate term on count 2, for a total term of three years plus 40 years to life.

Martinez-Soto filed a notice of appeal.

## DISCUSSION

**The Trial Court Did Not Err In Refusing the Defense's Proposed Pinpoint Instruction**

While discussing the jury instructions, defense counsel requested that the trial court give the following pinpoint instruction: "Lloban Martinez-Soto does not forfeit the right to defend himself with a firearm, against imminent deadly force or force likely to produce great bodily injury, even if he was prohibited from possessing a firearm due to previous felony convictions."

The trial court responded:

"So in considering whether or not a pinpoint is appropriate—and I would note the general hesitation to write our own jury instructions in light of how appellate courts receive that. I would point everyone to the language in 2511. This is the Count 2 instruction where there's been a stipulation as to convictions. There is a bracketed portion that the court would read. And this relates to the possession of the firearm by the prohibited person. It's an instruction that tells the jurors do not consider this fact, the fact that he was a felon in possession, for any other purpose. Do not speculate or discuss the nature of the conviction.

"So, I do believe what you're asking for is included in this language. If there's any request for modifications of that language approved within the CALCRIM, we can discuss that. But I think that's exactly what that language is attempting to instruct the jury on.

6

"The fact that he's a felon in possession isn't relevant to anything else other than the finding in Count 2."

The trial court told defense counsel that "nothing prohibits you from arguing the language that you put in your pinpoint that's supported by the law and supported by the instruction."

The jury was ultimately instructed with CALCRIM No. 2511 on the felon in possession count, which instruction concluded as follows: "Do not consider the fact that Defendant was prohibited from possessing a firearm for any other purpose. Do not speculate or discuss the nature of the conviction."

During closing argument, defense counsel told the jury:

"But if you look at jury instruction 2511, it will tell you. On Count 2—which, by the way, he's guilty of Count 2. Don't tell anyone. . . . Count 2, possession of a firearm by a prohibited person, even a prohibited person can defend themself with a firearm if they're facing deadly force. And if you look at the self-defense instruction, you'll see there's no limitation. If imminent death is about to happen or great bodily injury, you can defend yourself with that level of force. It doesn't say anything about unless you're prohibited from a gun. And 2511, the instruction about whether he's guilty of Count 2, wink-wink, is clearly (*sic*). Right there in the instruction it says only consider the fact he's prohibited from possessing a firearm for purposes of this—you know, this count and offense. It doesn't apply in other respects. So the answer is an unequivocal yes. Yes, a human being prohibited from possessing a firearm is still entitled to use self-defense with a firearm if you find that that happened."

"A defendant is entitled to a pinpoint instruction, upon request, only when appropriate. [Citation.] 'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as

7

mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' [Citations.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing (*People v. Gurule* (2002) 28 Cal.4th 557, 659), or if it is not supported by substantial evidence (*People v. Bolden* [(2002) 29 Cal.4th 515,] 558)." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

The parties do not directly address the standard of review. Our Supreme Court has stated that "[t]he independent or de novo standard of review is applicable in assessing whether instructions correctly state the law" (*People v. Posey* (2004) 32 Cal.4th 193, 218), but recently applied an abuse of discretion standard in reviewing challenges to the denial of a pinpoint instruction on the ground that it was duplicative (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 497; see also *People v. Gonzales* (2012) 54 Cal.4th 1234, 1297–1298 [applying an abuse of discretion review to the trial court's denial of pinpoint instructions on mitigating factors in the penalty phase of a capital trial]). We need not resolve this issue, because we conclude that the trial court properly denied the requested pinpoint instruction even under the de novo standard of review.

As the trial court noted, the final line of the instructions on the felon in possession count told the jury: "Do not consider the fact that Defendant was prohibited from possessing a firearm for any other purpose." "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [finding failure to give pinpoint instruction harmless

8

where standard instructions and defense counsel's argument "fully explicated the defense theme" sought by pinpoint instruction].)

In any event, we conclude that any error from failure to give the requested pinpoint instruction was harmless.  As the parties agree, "[e]rroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard.  (*People v. Ervin* [(2000) 22 Cal.4th 48,] 91; *People v. Fudge* (1994) 7 Cal.4th 1075, 1111–1112; *People v. Wharton* (1991) 53 Cal.3d 522, 571; *People v. King* (2010) 183 Cal.App.4th 1281, 1317.)

"Reversal of a conviction in consequence of this form of instructional error is warranted only if, ' " 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." [Citation.]  The question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed.' (*People v. Reeves* (2001) 91 Cal.App.4th 14, 53 (quoting *People v. Breverman* [(1998)] 19 Cal.4th 142, 177, 178.)  ' "In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." [Citation.]' (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1432.)  We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel.  (*People v. Cain* (1995) 10 Cal.4th 1, 35–36; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.)" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830–831.)

The jury was instructed that it should not consider "the fact that Defendant was prohibited from possessing a firearm for any other purpose," including whether defendant acted in self-defense in connection with the murder count. " 'We presume the jury followed these instructions.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 30; see *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].) As noted, defense counsel conceded in closing that Martinez-Soto was guilty on count 2, and the prosecutor did not suggest in closing that the felon in possession count had anything to do with the murder count or with Martinez-Soto's claim of self-defense. In addition, defense counsel's closing argument expressly told the jury, based on the last paragraph of the felon in possession instructions, that the fact that defendant was prohibited from possessing a firearm "doesn't apply in other respects" and "a human being prohibited from possessing a firearm is still entitled to use self-defense with a firearm if you find that that happened." Under these circumstances, we find no reasonable probability of a more favorable result had the jury been given the requested pinpoint instruction.

**Substantial Evidence Supports the Jury's Finding that Martinez-Soto Did Not Act in Self-Defense**

Where, as here, a defendant challenges the sufficiency of the evidence to support the jury's finding that the defendant did not act in lawful self-defense, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Gurule, supra,* 28 Cal.4th at p. 630; *People v. Johnson*

(1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.) Although the reviewing court must reverse a conviction where the verdict finds no discernable support in the record, "it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.) And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)" (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

Martinez-Soto argues that "the record contains substantial evidence that [he] acted in lawful self-defense when he shot Mendez," pointing to certain evidence in the record suggesting that Mendez was the initial aggressor, including Mendez's history of violence, his past threats against Martinez-Soto and Avila, and certain of the crime scene evidence that was consistent with Mendez approaching Martinez-Soto and attempting to strike him with his knife—including Dr. Verilhac's concession on cross-examination that Mendez's injuries were also consistent with his turning and starting to rear back to deliver a knife blow when he was struck by the bullets.

But there was also substantial evidence that Martinez-Soto was the initial aggressor and that he had not acted in self-defense. Martinez-Soto had a long history of animosity toward Mendez, including explicit threats only weeks before the shooting that "that fucker [Mendez] is gonna get it." On the afternoon of the shooting, Martinez-Soto had been using methamphetamine for several days, which at certain levels can cause violent behavior. Only hours before the shooting, Martinez-Soto had confronted

11

Avila and Valentino at the hotel room, accused Avila of cheating on him, and pointed a gun at her. Ramirez testified that he heard the gunshots quickly after the car door opened, and he did not hear the shots preceded by any argument or threats. And Mendez had been shot twice from behind, which Dr. Verilhac testified was consistent with his having been turning away from the shots. Finally, rather than tell police that he had shot Mendez in self-defense, Martinez-Soto fled the scene, disposed of the gun, engaged in an hours-long standoff with a SWAT team, feigned ignorance about the shooting, and told police that he had been sleeping, from which the jury could infer that he was conscious of his guilt. (See *People v. Holloway* (2004) 33 Cal.4th 96, 142 [jury may infer consciousness of guilt from "willful falsehood or fabrication or suppression of evidence"].)

In short, the evidence was in conflict as to whether Martinez-Soto acted in self-defense, with substantial evidence supporting the conclusion that he did not. " ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' (*People v. Levitt* (1984) 156 Cal.App.3d 500, 509.)" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) The jury resolved this conflict adversely to Martinez-Soto, and substantial evidence supports their conclusion. "[I]t was for the jury to resolve that conflict and if it was resolved adversely to [Martinez-Soto], it is not for us to substitute our resolution for the jury's." (*People v. Webb* (1978) 83 Cal.App.3d 83, 94–95; see *People v. Morales* (2021) 69 Cal.App.5th 978, 989 ["the jury was free to disbelieve [defendant]'s claim that he was afraid and acting in self-defense, especially in light of the evidence to the contrary"].)

## DISPOSITION

The judgment is affirmed.

_____

Richman, J.

We concur:

_____

Stewart, P. J.

_____

Desautels, J.

*People v. Martinez-Soto* (A168320)